## Harry Adams, Appellee, v. Chicago and Erie Railroad Company, Appellant.

Gen. No. 41,344.

Heard in the third division of this court for the first district at the October term, 1940. Opinion filed April 8, 1942. Rehearing denied May 27, 1942.

FOLLANSBEE, SHOREY & SCHUPP, of Chicago, for appellant; CLYDE E. SHOREY and GERHARDT S. JERSILD, both of Chicago, of counsel.

RYAN, SINNOTT & MILLER, of Chicago, for appellee.

### Supplemental Opinion.

Mr. Justice Kiley delivered the opinion of the court.

This is an action under the Federal Employers' Liability Act brought in the superior court of Cook county for personal injuries suffered by plaintiff on the night of December 5, 1938, while he was a switchman employed by the defendant railroad. A jury found in special verdicts that the defendant was engaged in interstate commerce and that plaintiff was in the exercise of due care, and returned a general verdict for plaintiff for $50,000. The trial court after plaintiff remitted $15,000 denied defendants' motions on the verdict and for a new trial and entered judgment for plaintiff for $35,000. Defendant has appealed from that judgment and from the orders denying its motions.

The complaint consists of two counts. Plaintiff, in the first count, alleged his employment with the defendant, and described the railroad yard in which the accident occurred; alleged that the defendant was subject to the provisions of the Federal Act and outlined the details of his work on the night of the accident; and charged the defendant with negligence through its servants, plaintiffs' co-workers and others, who he claims, violated certain rules promulgated by the defendant and, as a result of which, an emergency was created in which plaintiff in the performance of duty was injured. In the second count in addition to the preliminary allegations of count one, plaintiff claims that he was injured as a result of the departure by the defendant from its uniform custom of protecting employees in a certain movement of freight cars. The answer denies the material allegations in both counts of the complaint; and admits the existence of the rules but denies their violation. It denies that there was such a custom as the plaintiff outlines in count two; states that the defendant was in the exer-

cise of due care; that plaintiff was injured solely because he was negligent in not keeping proper lookout and in not using his faculties; and that he assumed the risks and dangers of his work and suffered no injuries because of any negligence of the defendant.

Defendant's "51st Street Yards" is laid out in a north and south direction and has thirty-seven sets of tracks which run north and south numbered 1 to 37 from west to east. For our purposes we need consider only those north and south storage tracks numbered from 15 to 24, both inclusive; the "rolling lead" which extends northeasterly from 15 to 23, and to which the intervening tracks are connected by switches located at the points where those tracks meet the "lead." The "lead" is used to facilitate switching operations. In gathering cars for a train, an engine is coupled to cars on the storage tracks south of the "lead" and moved north on to the "lead," then northeast until the end car is north of the storage track switch. That switch is then closed and the cars "kicked" free of the engine on their own momentum or pushed southwest down the "lead" to the make-up track. The operation is different at 23 track for the "lead" there joins with 23.

It appears that the night of December 5, 1938 was dark and misty, the railroad yard dark and unlighted and plaintiff's crew with Engine No. 1767 was engaged in making up a train. The crew consisted of Conductor Travis, Engineer May, Fireman Neely and Switchmen Fleming and Adams, the plaintiff, with Travis in control of the work under the supervision of Yardmaster Specker. Just prior to the accident the engine had pulled a "cut" of cars north on track 23 beyond the "lead" switch and after the switch was closed had commenced pushing the "cut" southwest on the "lead." This operation brought the line of the train into a curve, so that Travis southwest of switch 23 at the make-up track was out of view of

Engineer May on the east side of the engine on track 23. Travis was directing the operation from the make-up track by means of signals given to the switchmen, and transmitted by them to the engineer, by lighted lanterns. During this movement on track 23 and the "lead" plaintiff was run down by a "cut" of cars which had been "kicked" south on track 24, by another switching crew under Conductor Pool, and the east wheels of the first car of the "cut" ran over plaintiff's left leg. He caught hold of the brake rod beneath the car, pulled himself off the rail, was dragged between the rails and received serious injuries. The evidence is in direct conflict in a great many details of the circumstances of the accident and prior events. Defendant contends the verdict is against the manifest weight of the evidence.

Plaintiff says his crew worked on the day of the accident on the rip track from 4:00 to 6:00 p.m. and did not go to the Stock Yards and had no derailment that day, but that he had heard that Pool's crew had one. A written report introduced as plaintiff's exhibit 35, indicates that Engine No. 1767 passed the Chicago & Western Indiana Railroad Company 47th street tower at 4:27 p.m. going toward the Stock Yards and passed in the opposite direction at about 7:31. Defendant's testimony is that the first operation of the crew was to go to the Stock Yards for a load of grain cars and that on the return trip the train was derailed for about an hour; that no wrecking crew aided in the re-railing; that part of the system was tied up for about an hour; that this was an "unusual" and "out of the ordinary" operation for plaintiff's crew, but Conductor Pool of another crew which generally did this work, needed help that day. Fleming testified that when his pre-trial deposition was taken, he did not remember anything about the trip but that it came back to him since he saw the written report made by Travis of the movements of the crew. A

report written by Travis indicates, and from Specker's testimony it appears that he believes, that plaintiff's crew brought all 30 grain cars back to 51st street but Pool says that his crew brought 14 back, leaving only 16 for plaintiff's crew.

Plaintiff testified that his crew after finishing work on the rip track, next took their caboose to the 14th street Freight House and brought a train back to 51st street, leaving 14th street at 8:00 or a few minutes after. The defense is that the train of 28 cars left 14th street at 8:40 and arrived at 51st street at 9:05. Travis said that before he saw the written report he was mistaken by an hour in the time of the arrival from 14th street; that he previously said 8:40, but now knows it was later. The "Wheel Report" shows Engine No. 1767 with one car passed 47th street interlocking plant at 7:44 and Engine No. 1657 passed that point with 28 cars at 9:01. Plaintiff's exhibit 35 also shows Engine No. 1767 left 14th street going south at 8:40 p.m. with 28 cars.

Plaintiff testified the crew went to supper about 8:40 p.m.; Travis, 9:05; Fleming, 9:15; Specker, 9:15; May, 9:20 or 9:30; and Neely, between 9:45 and 10:00 o'clock. The conductor's report shows 9:15.

Plaintiff urges that errors in the reports and discrepancies between defendant's witnesses and the various reports render the reports ineffective. Specker indicates the crew brought 30 cars from the Stock Yards. Pool says he brought 14 of these cars to 51st street leaving plaintiff's crew but 16. The report of Travis shows 30 cars. Specker says that the crew dared to put only 20 minutes for supper in their report, thus implying a possibility of falsification. Engine No. 1741 is erroneously recorded as Engine No. 2019 in a report. The Wheel Report shows No. 1657, passed 47th street at 9:01 when other evidence would indicate that the engine actually was No. 1767. The jury is determining the weight to be given the

evidence in this case, had before it these inaccuracies and discrepancies.

Plaintiff contends that the testimony of the movements prior to the accident is immaterial, but defendant insists that the conflicting stories of those movements show the falsity of plaintiff's testimony and discredit his case throughout. We have examined the evidence closely and we cannot say that if the jury believed plaintiff's testimony of these movements, or believed the defendant's but considered the testimony immaterial, that the verdict is affected. Nor can we say that the jury or we, if defendant's story of these movements is true, should disbelieve for only that reason the balance of the plaintiff's testimony. The jury may have discredited the reports of trains, because of inaccuracies; may have refused to believe that plaintiff's crew would have been permitted to tie up part of defendant's system upwards of an hour in rerailing the engine when help might have been called; and may have viewed with misgiving the defendant's story of the trip which was designated by its witnesses as "unusual" and "out of the ordinary."

Plaintiff testified that after supper the caboose was placed on track 15 for the make-up. The defense testimony is that the caboose was placed for the make-up on track 17. Fleming, May and Specker were not convincing in support of this defense, stating that track 15 was ordinarily used for this purpose; that the custom was to make the train up on track 15 and that there was nothing to prevent using track 15 that night. Plaintiff had said there were cars intervening on north and south tracks between 23 and 15, so that one could not see the cars on 15 from 23 switch. The defense was that lanterns at 23 switch were visible from track 17 where Travis and Specker were standing.

After several cars were taken off storage tracks and "kicked" down the rolling lead, the engineer pulled

two cars off 22 and on to the rolling lead, then northcast into 23 and after the 23 switch was opened, backed south into 23 track for more cars. Plaintiff says that at this point, Fleming was west of the "lead"; Specker not in the vicinity; and Travis was at the coupling point on the east side of 23. Specker, Travis and Fleming say they were together on the east side of south 23 and May says he saw three lanterns down there. Fleming said he had walked east from the last movement on track 22. May says that plaintiff rode in and out of south 23 in the cab of his engine, though his fireman does not say so and Specker, Travis and Fleming inferentially contradict May. May also testified that that night he could see 200 feet, and, while he could not distinguish Travis and Specker on the east side of 23, about two cars away, he could see Fleming's face clearly at the rear of the fifth car on the north movement after the coupling.

Plaintiff says that Travis made the coupling on track 23 and cut off the cars not wanted; that Fleming was on the west side of the "lead"; and that Travis signaled the cut north. Travis, Specker and Fleming say that Fleming made the coupling and cut. Coupling, however, was part of Travis' work and he had coupled cars on preceding tracks in making up the same train and was at the coupling point involved. Fleming says he made the cut after the entire string of cars was moved up to where he had made the coupling, while Travis and Specker say that Fleming walked down to the end of the third coupled car and made the cut. The train moved north of 23 switch and Adams says Fleming who was on the west side threw the switch and came over to the east side to where Adams was. Fleming says he rode the "cut" north, then got off, threw the switch and crossed over to where Adams was. All agree that Travis walked west from the coupling point at track 23, while the defendant's testimony is that Specker walked west

with him. Fleming threw the 23 switch, but the defense testimony is that that work should have been done by Adams who was then head man; and further that men in switching operations frequently changed places. Adams says he and Fleming had changed places at 23 switch and that he had gone down the "lead" to keep Travis in view, Fleming denies that they changed places and says he went down the "lead" on the stirrup of the leading car of the "cut." Adams says he went down to the vicinity of 19 or 20 switch leaving Fleming at 23 and the defense is that Fleming got off between 20 and 21 while Adams was still at 23. Adams says Travis went between cars in track 15 and out of sight. Travis says that he went in to adjust a knuckle on a car on track 17; that if cars were northeast of him at the time, he would be out of sight of a person in the vicinity of 23 switch; and that when he had adjusted the knuckle, the leading car on the rolling lead northeast of him was within a half car or a car length away. Adams says he lost sight of Travis and gave the emergency signal to Fleming at 23 switch, that Fleming was not there and Adams then ran east and was run down. Fleming says he lost sight of the engineer when he rode the stirrup south of 23 on the "lead" and was attracted to the accident by Adams' cry and light and that then he signaled the engine down. The engineer, however, was out of Fleming's sight and Adams out of position to pass the signal. The Engineer May says that Fleming was out of sight when the first car passed 23 switch; that Adams walked southeast between 23 and 24 and that a "cut" kicked by Pool's crew south on 24 obscured May's view of Adams; and that he thereupon blew several blasts of his whistle which could be heard all over the yard, but kept on shoving southwest until he heard Fleming shout, then he stopped. Only Neely of the defense witnesses appears to have heard May's whistle, but May, while he did not

see Fleming's signal to stop, heard Fleming call. Adams says he ran directly east for a place between 23 and 24 tracks, from which May could see his signal. The defense is that a point directly east of 19 switch on the west rail of track 24 is 227 feet south of 23 switch and that a point on that rail opposite 20 switch is 288 feet south of 23 switch. This testimony was to show that had Adams run directly east, he would have been cut down at one of those points south of 23. The defense testimony is to the effect that there was blood and pieces of flesh on the east rail of track 24, only 79½ feet south of 23 switch and foot prints and marks of dragging in the ballast between points 66½ feet and 188½ feet south of 23 switch. On the last measurement there is a difference in testimony of defense witnesses. The men who testified to the distances made their examinations the morning following the accident, while Specker said he saw the blood marks and flesh clearly by lantern light shortly after the accident. This testimony is to support the theory of defendant that Adams stepped east into or walked southeast into track 24 from switch 23 and was struck down by reason of his own negligence in failing to use his senses to detect the "cut" of cars on 24. It would appear from the measurements that if plaintiff ran directly east from 19 or 20 he could not have been run down within 227 or 288 feet south of 23 switch. Plaintiff says he ran east and fell in the track after stumbling over something in his way. May says he walked southeast into that track.

Plaintiff claims there was a custom of warning employees working on the "lead" at night of the movements of the cars south on 24, and also a custom, when employees were so engaged, of "shoving" cars down the track instead of "kicking" them down unlighted and unattended. The defense witnesses on this point deny there was any such custom and plaintiff testifies of cars and "cuts" of cars being "kicked" un-

attended down the "lead" that night by his own crew, and the inference would seem to be justified that the custom testified to by plaintiff did not in fact exist. Whatever the custom, however, we feel that defendant's testimony of the movement of the cut of cars on 24 disclosed a highly dangerous practice in consideration of the lighting in the yard and the narrow path between tracks 23 and 24.

From this summary of what we consider the facts decisive of this case, we believe the conflicts therein presented a case for the jury and that the verdict of the jury was not against the manifest weight of the evidence. In causes such as this, where the conflict in the evidence is so sharp, an important factor in aid of the decisions is the opportunity of seeing and hearing various witnesses so that due credibility may be given their testimony. The jury saw and heard the witnesses in this case and believed the plaintiff's story. We have considered the unusual circumstances of the accident as related by plaintiff, as well as the coincidences and discrepancies in defendant's testimony, and we cannot, in the view we take of the evidence, substitute our judgment for that of the jury.

There is evidence in the record to sustain the charges of plaintiff's complaint and the trial court, therefore, did not commit error in denying the motion of defendant for judgment notwithstanding the verdict or for a directed verdict.

Company rules numbered 512, 526, 527, 548 and 582 were introduced in evidence in support of plaintiff's case. Defendant objected to their admission and claims error in receiving the rules in evidence. It does not appear that the admission of Rule No. 526, was justified, for there is no evidence to connect it with the case. The other rules give directions to defendant's employees as to safe procedure in making movements of trains. The plaintiff claims that Travis, the conductor, went between cars on track No. 15, out of

view of the plaintiff, thereby violating a rule; that plaintiff immediately gave a stop signal to Fleming at switch 23 and Fleming had left his post there in violation of a rule; that having left his post, he was out of view of the engineer who should have stopped immediately and not having done so the latter violated a rule.

Plaintiff contends that these violations created an emergency in which he acted to save Travis and that while so acting he was injured by the further negligence of the defendant. Defendant answers that while plaintiff's act may have been commendable and though he may have acted prudently, no liability attached to defendant because it had not negligently placed Travis in danger and owed no duty to plaintiff, the breach of which caused his injury. A rule the defendant invokes here, as stated in *Ingram v. Jackson*, 206 Ill. App. 466, is that, to remove the effect of contributory negligence on the part of a person injured while attempting to rescue a life in an emergency, the emergency must have been created by the negligence of the defendant. The *Ingram* case was not a proceeding under the Federal Employees Liability Act and the plaintiffs there were trespassers on the road. Defendant to benefit under the rule, seeks to absolve the defendant from liability for the negligent acts of its employees Travis, Fleming and May. The fellow servant rule, however, has been abrogated by the act. *Minneapolis, St. P & S. Ste. M. R. Co. v. Rock*, 279 U. S. 410; *Devine v. Chicago R. I. & P. Ry. Co.*, 266 Ill. 248; *Taylor v. Atchison, T. & S. F. Ry. Co.*, 292 Ill. App. 457. It would follow, therefore, that proof of negligence of plaintiff's fellow employees in creating the emergency in which he was impelled to act, if the proximate cause of plaintiff's injury, was sufficient to justify recovery against defendant. The evidence tends to show that plaintiff, as a result of the emergency and while running in defendant's unlighted yard at night, stumbled

over something in a path and fell, between the rails of another track, following which he was run down without warning by a "cut" of cars kicked down, unlighted and unguarded on that track. The defendant claims there is no showing that the violation of the several rules by the defendant was the proximate cause of plaintiff's injury. The case of *New York Cent. R. Co. v. Brown*, 63 F. (2d) 657, cited by plaintiff states the rule applicable here, that the chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation created by negligence. It was plaintiff's position at the trial that the emergency, created by the negligence of defendant's servants, stimulated him to try and rescue Travis. We also believe that the discussion by this court of the proper rule of proximate cause, in the case of *O'Connor v. Brower,* 262 Ill. App. 621, 625, is cogent. Applying the views expressed there to the instant case, we believe defendant's claim is untenable unless it appears from the evidence that the injury to plaintiff would have happened, though his co-workers had not violated the rules. To sustain defendant's claim it must appear that plaintiff would have run east, stumbled over something in his path and have fallen between the rails on track 24 and have been run down, though the rules had not been violated. The intervening circumstance, plaintiff's movement east, was a direct and natural consequence of the violations and did not break the continuity of events leading to the injury. We cannot find that plaintiff would have been injured had his fellow employees not been negligent in violating the rules, consequently, we must find that their negligence was the proximate cause of his injury. The defendant to sustain its point cited the cases of *Bacon v. Payne,* 220 Mich. 672 and *State ex rel. Lusk v. Ellison,* 271 Mo. 463. The *Bacon* case held that the reckless conduct of the person struck by the train was the proximate cause of the accident. The

decedent therein was held to have acted rashly and recklessly in what he considered an emergency, and thus broke the chain of causation. In the *Ellison* case the court held that the failure of the engineer to look for a signal from plaintiff, was not the proximate cause of the injury. There the plaintiff, when he observed the engineer looking away from the signal, stepped further out into the path of a train coming in the opposite direction and the court held that the engineer had a right to assume that plaintiff, so far as the other track was concerned, would protect himself. Juxtaposing those cases with the instant case, they are immediately distinguishable. The jury did not, and we cannot, find that the plaintiff here acted rashly or carelessly nor that any such conduct was the cause of his injury. There is no evidence here either that plaintiff could have protected himself against the "cut" of cars "kicked" down track 24. On the other hand the proof shows that the "cut" was "kicked" south on 24 in the nighttime without warning and without lights, unseen or unheard by any of plaintiff's crew, except May and Neely, as the cars passed the engine. Nothing in the record justifies an inference that had plaintiff used his faculties, he would have seen or heard the "cut" which injured him. We find that the rules with the exception noted were properly admitted in evidence.

Defendant says plaintiff's injury was solely and proximately caused by his own negligence. The jury decided this contention against the defendant and we see no reason to disturb its determination.

Defendant further contends that the injury sustained by plaintiff was the result of risks incident to his employment and were assumed by him. The jury was instructed on the question of the assumption of risk. Under the rule of assumption of risk plaintiff, it seems, would have assumed the dangerous movement of cars on track 24, had it not been for the viola-

tions of the rules by plaintiff's co-workers. The rule might have precluded his recovery had his injury occurred while he was engaged in ordinary switching duties, but, because of the violations, that is not the case here. He was injured while acting in an emergency created by the negligence of defendant's servants, and the rule of assumption of risk is not applicable. Defendant in this connection relies mainly upon *Fernald v. Boston & M. R. Co.,* 62 F. (2d) 782. In that case the sole ground upon which plaintiff sought recovery was negligence in departure from a custom, consequently, the case is not decisive here.

At the beginning of the trial the court overruled defendant's motion to exclude from the courtroom plaintiff's wife and eight-year-old daughter. At the conclusion of the trial defendant filed an affidavit setting forth their attendance at the trial and affirming that before the jury retired after instructions, plaintiff's daughter went to her father at counsels' table in view of the jury. Counter affidavits were filed by plaintiff and his wife. The court had before it the various affidavits and we cannot say from a consideration of all the circumstances that the court committed error in determining the question of prejudice adverse to the defendant. Neither do we find error in the court's ruling upon questions asked by plaintiff's counsel on cross-examination of witnesses who had been examined before the trial. The questions sought to disclose why witnesses had omitted to state certain facts in pre-trial examination which were stated at the trial.

Defendant contends finally that despite the remittitur made after the verdict of the jury was rendered, the judgment for plaintiff in the amount of $35,000 is excessive. Plaintiff's leg was amputated six inches below the knee joint. The amputation left an irregularity of the stump which made suitable padding thereon impossible without further surgery. There is no assur-

ance that such surgery would permanently correct the stump and, consequently, no assurance that plaintiff will be enabled to wear an artificial limb. In addition plaintiff sustained injury to his shoulder which disclosed crepitation at the time of the trial. It appears that plaintiff is not equipped to do office work, having passed the working years of his life in physical labor, and because of his bodily impairment his future earnings are questionable and uncertain. He was 30 years of age at the time of the accident, making an average annual wage of about $1,800. It appears that, with reasonable certainty, he would with the passing years in the employment of defendant, have bettered his position. We believe that the judgment of the trial court is not excessive. *Pipal v. Grand Trunk Western Ry. Co.*, 255 Ill. App. 637 (Abst.).

We have given attention to the several points raised by counsel which we consider material to the decision, and for the reasons herein given, the judgment of the superior court is affirmed.

*Judgment affirmed.*

BURKE, P. J., and HEBEL, J., concur.