Yvonne Chapman and Mildred Marchese, Appellants, v. Baltimore and Ohio Railroad Company and Jay Bilthuis, Appellees.

Gen. No. 44,803.

Opinion filed May 3, 1950.
Rehearing denied May 23, 1950. Released for publication May 23, 1950.

DELMAR J. HILL and THOMAS P. FOLEY, both of Chicago, for appellants.

JAMES F. WRIGHT and E. W. LADEMANN, both of Chicago, for certain appellees; FAY WARREN JOHNSON, of Chicago, of counsel.

ROSS, BERCHEM & SCHWANTES, of Chicago, for certain other appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Yvonne Chapman and Mildred Marchese sued the Baltimore & Ohio Railroad Company and Jay Bilthuis for injuries received in a railroad crossing mishap while guest passengers of Bilthuis, charging the corporation with negligence and Bilthuis with wilful and wanton misconduct. At the close of plaintiffs' evidence the court directed a verdict in favor of Bilthuis and entered judgment thereon. The case proceeded against the corporate defendant and resulted in verdicts of guilty, one assessing Miss Chapman's damages at

$5,000, and the other assessing Miss Marchese's damages at $500. Judgment was entered on the verdicts. Subsequently, on motion of the railroad, the court entered judgment in its favor notwithstanding the verdicts, and also conditionally granted it a new trial. Plaintiffs appeal. For convenience we will call the railroad corporation the defendant and Bilthuis by his name.

The injuries were sustained at about 2:00 a. m. Saturday, March 9, 1946, at a grade crossing on West 71st street, an east and west street in Chicago. The crossing is located about 3½ blocks east of Western avenue. The B. & O. C. T. railroad tracks run north and south and cross 71st street at right angles. These tracks are used exclusively for freight traffic. At the time of the occurrence the crossing was not protected by any watchman, gate or flasher lights. Defendant's freight train involved in the case started the evening of Friday, March 8, 1946, from Garrett, Indiana, on a' regular run to Glen Yard, Chicago. The Glen Yard is located west of Brighton Park, Chicago, on the Alton line, the B. & O. turning off on the Alton tracks where it crosses that line at about 40th street. Defendant's train was operating over the right of way of the B. & O. C. T. The freight train was not running on a definite, schedule. It was proceeding north and consisted of a steam locomotive, 14 cars and a caboose. On the way to the Glen Yard the train was first reduced by setting off cars at the Barr Yard near 135th and Halsted streets. From there the 14 cars were to be taken to Glen Yard, with 71st street, where plaintiffs were injured, to be crossed on the way. The crossing at 71st street consists of three tracks. From west to east they are : a, siding track; the southbound main and the north-; bound main. The train was traveling in the northbound main. The first north and south street to cross 71st street east of Western avenue is Claremont av-

enue. Oakley avenue, a north and south street, crosses 71st street a block east of Claremont avenue, and Bell avenue, another north and south street, intersects 71st street a block east of Oakley avenue. From Bell avenue to the railroad crossing is another half block or so.

Plaintiffs live a half mile east of and were acquainted with the crossing. Bilthuis had attended high school in that neighborhood. He was familiar with the crossing and had traveled over it often. On Friday evening, March 8, 1946, Bilthuis, aged 21, accompanied by his friend Andrew Waitches, about 25 years old, called at the home of Yvonne Chapman, 18 years old, and her next door neighbor, Mildred Marchese, 20 years old. The four then left in a four-door 1941 Nash sedan automobile, driven by Bilthuis and owned by his father, to go skating at the Arena on the north side of Chicago. On the return trip from the Arena it was sleeting, turning to snow, and the roads were slippery and slick. The parties stopped at a restaurant near 47th and Western avenue, after which they proceeded south to 71st street, where they turned east. From the time they left the restaurant until the occurrence the weather was clear. Miss Chapman was sitting to the right of Bilthuis, the driver. Miss Marchese sat to the left of Waitches on the rear seat. At the time 71st street was icy. In this respect, however, it was no different from the other streets over which the parties had traveled. Bilthuis testified that his highest speed on 71st street was 15 to 25 miles an hour. He said his car did not tend to slide around because it was not going fast. The car had sealed beam headlights. When the car was traveling on 71st street they were adjusted for country driving and threw a beam of light for about a block. He said that the brakes were in good working order.

Photographs as to the conditions surrounding the crossing were introduced by the respective parties. These show that the distance from the east curb of

Bell avenue to the tracks is about 250 feet and that the paved portion of Bell avenue is 30 feet wide. The intervening natural terrain for at least two or three blocks south of 71st street is level. The tracks, however, run on an artificial embankment, which at 71st street is about eight feet high. Consequently, 71st street is so graded as to carry the roadway up to the top of the embankment. The resulting incline of the street, as one proceeds east, begins a short distance east of Bell avenue and ends just before the first (west) track is reached. The crossing itself is level. The tracks run slightly uphill as they come north. At 71st street and for two or three blocks to the south the area between Bell avenue and the tracks contains no buildings, trees, bushes or other obstructions. At the west side of Bell avenue is a ''slow'' sign for eastbound traffic. A photograph shows a square sign with its post embedded in the south parkway of 71st street about a third of the way, as one travels east between Bell avenue and the crossing. A crossing (crossbuck) sign was located 15 feet and 11 inches west of the west rail of the first (siding) track and 7 feet south of what would be the south curb of 71st street. A motorist driving east on 71st street would first observe the ''slow'' sign on the west side of Bell avenue, then the square sign east of Bell avenue and lastly the crossbuck sign.

Bilthuis testified that he did not see any headlights; that he did not see any light toward the south or any train approaching; that he was listening for a whistle or a bell; that he did not hear any; that he continued to listen for a whistle or bell until he got up to the tracks; that he heard neither during that time; that he came upon the crossing at a speed of 15 miles an hour; that the locomotive was moving up 5 or 10 feet south of the south crosswalk when he saw it; that the first thing he saw was the numeral lights of the engine on the side up near the smokestack; that he could not

see the headlight apparatus; that there was no glare on the tracks ahead of the engine; that at the first sight of the illuminated numerals the front of his car was 15 feet from the track the train was on; that as soon as he saw the engine he applied the brakes; that the car started to slide; that it slid about 5 feet with the brakes on; that then, because of the sliding, he released the brakes and cut the wheel a little bit to the north; and that the car "sort of responded" to the turn of the steering wheel and the side of the engine caught the right front of the automobile, tore off the hood and twisted the car around so that it stopped facing west. What distance, if any, the car moved between the cut of the wheel and the impact does not appear. At the time of the impact the car was a few feet out of its original path and part of the car was on the north half of the pavement. After the occurrence the car was on the gravel north of the pavement. An exhibit shows that the whole front of the car was crushed back and somewhat from right to left. The point of impact on the locomotive was somewhere along the left side a little ahead of the cab. Bilthuis said his car did not stop from the time he first saw the train until the impact and that the reason was that the car was sliding and skidding on the ice. Miss Chapman was thrown out of the car and beneath it and Miss Marchese was thrown from the rear seat to the floor. When it stopped, the rear of the train was about four car lengths north of 71st street.

 The first point advanced by plaintiffs is that they made out a prima facie case against the defendant railroad and that the court erred in entering judgment in its favor notwithstanding the verdicts. Defendant maintains that it was entitled to judgment notwithstanding the verdicts; that the sole proximate cause of plaintiffs' injuries was the conduct of Bilthuis in taking the automobile into the side of defendant's

485

engine; that there was no evidence tending to show that it was guilty of any negligence; that plaintiffs were not in the exercise of due care for their own safety; and that the icy condition of the street was the proximate cause of their injury. By a motion for judgment notwithstanding the verdict the sole question presented to the court is whether, admitting the evidence in favor of plaintiffs to be true, that evidence, together with all legitimate conclusions and inferences, fairly tends to sustain their cause of action. In deciding such a motion the court has no right to pass upon the credibility of the witnesses, to consider any purported impeachments, the weight thereof, or the weight of the testimony. *Vieceli v. Cummings*, 322 Ill. App. 559. In deciding whether the court erred in allowing judgment notwithstanding the verdicts, we shall consider only the evidence in favor of the plaintiffs. Plaintiffs charge that the proximate cause of the occurrence was the negligence of defendant in operating its train without headlight, bell or whistle up to the point where the engine was when Bilthuis first saw it. Sec. 6 of an Act in relation to fencing and operating railroads (par. 59, ch. 114, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 114.095]) provides that every railroad corporation shall cause a bell of at least thirty pounds weight, and a steam whistle placed and kept on each locomotive engine, and shall cause the same to be rung or whistled by the engineer or fireman, at a distance of at least eighty rods from the place where the railroad crosses or intersects any public highway, and shall be kept ringing or whistling until such highway is reached. Sec. 1 of an Act in relation to the equipment of locomotive engines with headlights (par. 187, ch. 114, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 114.154]) provides that all common carriers by railroad shall be required to equip and maintain and use on all locomotive engines used by them in freight service, a head-

light of sufficient candlepower, measured with the aid of a reflector, to throw a light in clear weather that will enable the operator to plainly discern an object the size of a man, upon the track, at a distance of 450 feet from the headlight, provided that the Act shall not apply to any locomotive engine running between sunup and sundown.

In their complaint plaintiffs allege that they were in the exercise of due care for their safety at and about the time complained of. This allegation is a material averment which they must prove affirmatively in order to recover. Defendant contends that this proof was wholly lacking. There was evidence that for the greater part of a distance of more than 250 feet before reaching the crossing each of the plaintiffs looked to the south for a headlight or other indication of any train and listened for a bell or whistle. They saw no light and heard no sound. Since their view of the track to the south was unobstructed it is a legitimate inference in their favor that the approaching train bore no light and emitted no bell or whistle signal. Bilthuis also testified that although he looked, he saw no train or headlight from a train until he was 15 feet from the northbound track. Defendant states that Bilthuis and plaintiffs had a good view and that the numeral lights on the side of the engine were moving up toward the crossing in the stretch of right of way where the view was so unobstructed; that Bilthuis and plaintiffs could have seen the numeral lights on the side of the engine as the automobile moved eastward between Bell avenue and the crossing had they looked; and that the reason for these parties not seeing the headlight of the engine was because no one was looking ahead or to the side for it. The numeral light was small and dim and especially so in comparison with a standard locomotive headlight. Whether the parties could see the light would be a question of fact for the jury. We

487

cannot say that all reasonable men would agree that such a light could be seen as the automobile proceeded from Bell avenue. By custom the approach of an engine in the nighttime is heralded by a reasonably strong headlight. In support of its position defendant cites *Dee v. City of Peru,* 343 Ill. 36; *Briske v. Village of Burnham,* 308 Ill. App. 531, affirmed 379 Ill. 193; *Flynn v. Chicago City R. Co.,* 250 Ill. 460, and other cases. In the *Dee* case the court said (42):

"The law will not tolerate the absurdity of permitting one to testify that he looked and did not see the danger when the view was unobstructed, and where, if he had properly exercised his sight, he could have seen it."

In that case the driver of the car, George Schuets, with Joseph G. Dee, the decedent, as a passenger, drove the car off a bridge into the Illinois River at Peru through an opening occasioned by the bridge drawspan. It was undisputed that on approaching the bridge the gate, when closed, was fully visible for a distance of more than 100 feet. The car traveled at least 90 feet after the gate came into full view to the point where Schuets stated he saw it. He stated that he did not see the gate until he got within 20 feet of it and that he was going 30 to 35 miles an hour. The court said that Schuets and the decedent had an unobstructed view of the approach to the bridge and the obstruction across the roadway for a distance of at least 110 feet; that the car at a speed of 35 miles an hour could be stopped by application of the brakes in a distance of 50 to 55 feet; and that with the clear vision of the barrier across the bridge, a distance of 110 feet was ample to stop the car going at that rate of speed before the gate was reached. In the case at bar the plaintiffs looked and listened. The mishap in the *Dee* case occurred in the daytime. Furthermore,

the gate was visible to the driver for a distance of 110 feet in ample time to stop the car. We have read the other cases cited by defendant and in our opinion they are inapplicable to the factual situation presented to us. We are satisfied that, viewing the evidence in its aspect most favorable to the plaintiffs, there was prima facie proof of the exercise of due care by plaintiffs.

■ ■ We turn to the contention of plaintiffs that there was sufficient evidence to justify the jury in finding that the negligence of defendant was a proximate cause of the injuries. Defendant states that there was no evidence tending to show that it was guilty of any negligence, and that the sole proximate cause of plaintiffs' injuries was the conduct of Bilthuis in taking the automobile into the side of the engine. There was evidence that the engine approached the crossing without a headlight burning and without emitting the statutory signals. The violation of a statute is prima facie evidence of negligence. *Wise v. Kuehne Mfg. Co.*, 322 Ill. App. 26; *Carroll v. Krause*, 295 Ill. App. 552. The defendant was bound to take notice that the public used the crossing and that any failure to give the statutory signals, or otherwise neglect to exercise care for their safety, would place travelers in great danger. *Illinois Terminal R. Co. v. Mitchell*, 214 Ill. 151; *Indianapolis & St. L. R. Co. v. Stables*, 62 Ill. 313. In *Chicago B. & Q. R. Co. v. Triplett*, 38 Ill. 482, the court, speaking of a daylight accident, said that ''the Legislature have very wisely required that the whistle shall be continuously sounded, or the bell rung, for a distance of eighty rods before reaching the crossing,'' and that a traveler is ''at least entitled to such warning of the approach of danger'' as the statute requires so that he may have a chance to be ''saved by the warning.'' See also *Brown v. Illinois Terminal Co.*, 319 Ill. 326; *Bernier v. Illinois Cent. R. Co.*, 296 Ill. 464; and *Robertson v. New York Cent. R. Co.*, 321 Ill. App. 313.

We conclude that there was evidence tending to show that the defendant was guilty of negligence.

 It was incumbent on plaintiffs to prove that the negligence of defendant was a proximate cause of their injuries. Proximate cause is defined as "any cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred." 45 C. J. § 477, Negligence. To constitute proximate cause, a negligent act or omission need not be the sole cause. 45 C. J. § 485. If the negligent act or omission is an efficient cause, such act or omission is actionable as a proximate cause, even though other causes, not attributable to plaintiff, combined with such negligence to produce the ultimate result. *Pullman Palace Car Co. v. Laack,* 143 Ill. 242. Such concurrent causes may be the acts of a third person, either wrongful or innocent, or some accidental, inanimate or natural force or an act of God, or some combination thereof, but whatever their nature in this respect, they will not relieve a defendant from liability if his negligence is one of the efficient causes of the injury or at least an efficient cause without which the injury would not have occurred. *Pullman Palace Car Co. v. Laack, supra; Village of Carterville v. Cook,* 129 Ill. 152; *City of Joliet v. Shufeldt,* 144 Ill. 403; *Armour v. Golkowska,* 202 Ill. 144; 45 C. J. Negligence, §§ 486 and 499; Restatement of the Law of Torts, § 439. Hence, the wrongful author of any efficient cause "is liable as though it were the sole cause." *Votrian v. Quick,* 271 Ill. App. 259, 263. The negligence is actionable if it is "a direct contributing cause" (*Storen v. City of Chicago,* 373 Ill. 530, 533) or if it "contributes directly to producing" the harm. *McClure v. Hoopeston Gas & Electric Co.,* 303 Ill. 89, 99. If the harm is a natural, probable and foreseeable consequence of the first act or omission, the original wrongdoer is liable,

notwithstanding "other causes, conditions or agencies" intervened between his negligence and the ultimate result. 45 C. J. Negligence, § 489. "Natural and probable consequences are those which human foresight can anticipate." *Rowell v. City of Wichita,* 162 Kan. 294, 176 P. (2d), 590, 596. It may be said that proximate cause is simply "a cause from which a man of ordinary experience and sagacity could foresee that the result might probably ensue. 50 C. J. Proximate Cause, p. 840. *McClure v. Hoopeston Gas & Electric Co., supra; Illinois Cent. R. Co. v. Siler,* 229 Ill. 390, 394. In considering whether the negligence of defendant in operating its train without headlight, bell or whistle up to the point where the engine was when Bilthuis first saw it, it is to be recalled that the omission or nonoperation of signals, required or customarily given to indicate the approach of a train to the crossing, is equivalent to an assurance by the railroad that no train is in fact approaching and constitutes an invitation by the railroad to travelers on the highway to proceed toward and over the crossing. *Langston v. Chicago & N. W. Ry. Co.,* 398 Ill. 248; *Humbert v. Lowden,* 385 Ill. 437; *Applegate v. Chicago & N. W. Ry. Co.,* 334 Ill. App. 141; and *Oswald v. Grand Trunk Western Ry. Co.,* 283 Ill. App. 86. This invitation to proceed was extended to Bilthuis and plaintiffs and accepted by them, not only on the first occasion they looked and listened, but on each occasion. It led them not only toward the crossing, but to the point where they were when the unlighted engine was first observed. Bilthuis was induced to approach the crossing at a speed of 15 miles an hour, which while 5 to 10 miles an hour less than he had generally traveled elsewhere that evening, did not contemplate the possibility that a train would suddenly loom up within a few feet of his course so as to make it imperative for the safety of himself and his passengers to stop instantly or practically so.

██ ██ When Bilthuis first saw the engine the front of his car, under the evidence most favorable to plaintiffs, was only 15 feet from the track the train was on. At 15 miles an hour the automobile was moving at the rate of approximately 22 feet a second. In two-thirds of a second, therefore, he would reach the track, and the engine, traveling 40 to 50 miles an hour, was only 20 or 30 feet away, so that it would intersect the path of the automobile before the latter would reach the track. There was no possibility that the automobile could cross the track in safety ahead of the train. Plaintiffs and Bilthuis were thus placed in a position of peril. The peril consisted of two elements— the location of the automobile and the fact that it was in propulsion at the rate of 22 feet a second. The momentum of the automobile, as well as its nearness to the track, were both an effect of defendant's invitation, or, in other words, of its negligence. Until that momentum could be arrested by the exercise of due care under the circumstances then and there existing, including the presence of the ice, every foot that the automobile traveled as a result of that momentum was a continuing effect of defendant's negligence. The evidence favorable to plaintiffs is that Bilthuis did exercise due care to arrest or divert that momentum, but was unable to do so, and that the momentum carried the automobile into the side of the engine. By a natural and continuous sequence that could have been foreseen and guarded against by defendant, the unsignaled approach of the unlighted train was either the sole cause of plaintiffs' injuries, or at least a cause that directly contributed to cause such consequences. In *Miller v. Union Pac. R. Co.*, 290 U. S. 227, 78 L. Ed. 285, 54 S. Ct. 172, it appears that the train approached the crossing in daylight without signals. Although it was in plain sight of the driver for 2,000 feet he continued on over the crossing and the automobile was struck.

In the suit of the guest the railroad contended that the negligence of the driver was an intervening efficient cause and the trial court directed a verdict on that theory. The Supreme Court, in reversing, said (235) that "the vice of the argument consists in the attempt to separate into two distinct causes (remote and proximate) what in reality is but one continuous cause— that is to say, an attempt to separate two inseparable negligent acts which, uniting to produce the result, constituted mutually contributing acts of negligence." Therefore, the negligence of the driver "did not interrupt the sequence of events set in motion by the negligence of the railroad company or insulate them from the accident, but concurred therewith so as to constitute in point of time and in effect what was essentially one transaction."

Defendant asserts that the icy condition of the street was the proximate cause of plaintiffs' injury. The existence of proximate cause precludes the possibility of superseding cause. *Belcher v. Citizens Coach Co., Inc.,* 327 Ill. App. 618, 626. An intervening cause, if it is to be sufficient in law to relieve the original wrongdoer, is inadequate when it merely combines or concurs with the operation of such negligence to produce a joint effect. The intervening factor must be new, independent and self-operating. See *Illinois Cent. R. Co. v. Siler,* 133 Ill. App. 2, affirmed 229 Ill. 390; *Milwaukee & St. P. R. Co. v. Kellogg,* 94 U. S. 469; and *Pullman Palace Car Co. v. Laack, supra.* That it was sleeting and very cold—conditions necessarily producing icy and slippery pavements—was known to the train crew before the negligence in question was committed. That ice existed on the pavements was therefore a known circumstance, pre-existing and surrounding the neglect of the defendant and constituting nothing new or independent, but merely a condition under which that neglect occurred. In this respect the

ice was of the same character and effect as the darkness. The darkness prevented Bilthuis from seeing the unlighted train; the ice possibly prevented him from stopping. Neither fact insulates defendant's negligence; nor was the ice self-operating. In and of itself it was inert. The intervening cause, if it is to insulate or render inactionable the original negligence, must not merely supplement the causal force of the orginal wrong, but must break or otherwise supersede such force. *Pullman Palace Car Co. v. Laack, supra.* The test, as stated in the *Pullman* case, is whether the intervening force was ''acting in and of itself in causing the injury, and superseding the original wrong complained of, so as to make it remote in the chain of causation.'' To break or otherwise supersede the original cause force, the intervening force ''must be one not produced by the alleged wrongful act of omission.'' Blashfield's Cyclopedia of Automobile Law and Practice, Perm. Ed. § 2534; 45 C. J. Negligence, § 492, to which is cited the famous squib case, *Scott v. Shepherd,* 2 Bl. 892, 96 Reprint 525, 3 Wils. 403, 95 Reprint 124. In *Adams v. Chicago & Erie R. Co.,* 314 Ill. App. 404, the court said (416) that ''the chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation created by negligence.'' Bilthuis' sudden application of the brakes was a natural reaction to the situation created by the negligence of defendant. In *Miller v. Union Pac. R. Co., supra,* the court said that the intervention must have ''the effect of turning aside the course of events set in motion'' by the original actor. The natural and probable effect of the failure of a railroad to signal the nighttime approach of its train to a crossing is a crossing collision of some kind. That such crossing accidents, so resulting, can occur under an infinite variety of circumstances is evidenced by the numerous cases in the reports. Under the circumstances, we are

of the opinion that it cannot be said that the intervention of the ice in the case at bar "prevented the natural and probable result" of the failure to signal or "turned aside" the course of events thereby set in motion.

 The intervention of the intermediate force must have been unforeseeable to the original wrongdoer by the exercise of due care. If the intervention of a new factor was in itself foreseeable, then of course such factor becomes simply an intermediate effect, and in turn an intermediate cause, in the chain of causation. In *McClure v. Hoopeston Gas & Electric Co., supra,* the court at page 104 adopted the following statement from 22 R. C. L. 134:

"Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequences, and if they are such as might with reasonable diligence have been foreseen, the last as well as the first, and every intermediate result, is to be considered in law as the proximate result of the first wrongful cause."

The defendant should have known that a motorist, unwarned of the approach of a train in the nighttime, will proceed up to and start across the tracks at a grade crossing under the assumption that no train is in fact approaching. Defendant cannot say that the intervention of the ice was unforeseeable. It is foreseeable that the motorist, acting out of superior caution and with no assistance from the railroad, might ultimately see the unlighted, unsignaled train approaching. When the pavement is icy the zone of peril is naturally wider than when the pavement is dry, and an automobile cannot be stopped so quickly on ice as on dry pavement. On a night when the pavement is icy the omission of signals may cause an accident that might not have occurred had the pavement been dry.

That fact, however, was not beyond the comprehension or foresight of defendant. Hence, the movement of the automobile on the ice was foreseeable and it cannot be deemed a superseding cause. The superseding cause must be an "efficient cause." *Heiting v. Chicago, R. I. & P. R. Co.*, 252 Ill. 466. It cannot be said that the ice alone, without the negligence of defendant, would have operated to produce the injuries to the plaintiffs. The ice was not an efficient cause of their injuries. The efficient cause, the cause that set the capabilities of the ice in motion, was the act of Bilthuis suddenly applying the brakes, and behind that, the negligence of defendant.

 Counsel for defendant places great reliance on *Berg v. New York Cent. R. Co.*, 391 Ill. 52, where the court said (66):

"The undisputed facts lead to the conclusion that the icy condition of the street was the proximate cause of the injury and not defendant's wrongful act. Under such circumstances there was no question of fact for the jury."

In that case the negligence alleged was the failure to sound whistle or bell. The headlight on the engine was burning and the occupants of the automobile, who were familiar with the crossing, knew they would have and in fact did have, a clear and unobstructed view of the lighted engine beginning at a point when the automobile was 76 feet from the crossing. There is no mention in the opinion of the Appellate Court (323 Ill. App. 221) or in the Supreme Court that either the plaintiff or the driver was listening for a bell or whistle. Without evidence of listening it cannot be inferred that the driver failed to reduce his speed in reliance on the lack of the bell and whistle. Not having attempted to hear the signals, the occupants of the automobile cannot be said to have relied upon their

absence. In the case at bar Bilthuis was going about 15 miles an hour, and when he saw the engine he had but 15 feet in which to stop if he were to avoid the collision. The driver in the *Berg* case, going 20 to 25 miles an hour had 76 feet in which to stop. In our opinion the principle announced in that case is not applicable to the factual situation in the instant case. In the case at bar no claim is made that plaintiffs or Bilthuis were in any way negligent after the engine was sighted. Some of the cases cited by defendant involve the collision of a motor vehicle with a train either standing upon or slowly moving over a crossing unprotected by gates or flasher lights. No statute requires a railroad, during the period of such crossing, to sound any bell or whistle, and by custom the side of a freight train carries no lights or reflectors. If the crossing is occupied, he must see and ascertain that fact in time to stop. He should not go too fast to stop within the range of what his headlights enable him to see. In *Briske v. Village of Burnham*, 379 Ill. 193, the motorist struck a barricade which carried a reflector at the dead end of a street. He was even more negligent than one striking the side of a standing train. We agree with plaintiffs that the icy condition of the street cannot be said, as a matter of law, to have been a supervening or insulating cause that relieves defendant of liability for the effects of its negligence. The court was in error in entering judgment notwithstanding the verdict in favor of defendant.

 Plaintiffs urge that the evidence presented a fair question of fact, unaffected by any error of law; that no irregularity intervened; that the verdict was conclusive; and that the court erred in conditionally granting a new trial. Defendant insists that the conditional allowance of its motion for a new trial was proper on the ground that the verdicts were against the manifest weight of the evidence, and that the dam-

497

ages allowed were excessive. The court acted under Supreme Court Rule 22 [Ill. Rev. Stat. 1949, ch. 110, par. 259.22; Jones Ill. Stats. Ann. 105.22], which provides that an appeal from a judgment granted on a motion for judgment notwithstanding the verdict, shall, of itself, without the necessity of a cross-appeal, bring up for review the ruling of the trial court on such motion for a new trial, and the reviewing court shall, if it reverses the judgment entered notwithstanding the verdict, review and determine the validity of the ruling on the motion for a new trial. Prior to the adoption of the Civil Practice Act there was no appeal from an order allowing a new trial. Under Sec. 77 of that Act [Ill. Rev. Stat. 1949, ch. 110, par. 201; Jones Ill. Stats. Ann. 104.077] an appeal from an order granting a new trial may be sought by a petition presented to the reviewing court within 30 days after the entry of the order, or within any extended period granted within such 30 days, or any further extension thereof. Where a conditional new trial is granted under Rule 22 the appeal from the judgment granted on motion for judgment notwithstanding the verdict brings up for review the ruling of the trial court on the motion for a new trial without the necessity of a cross-appeal and without the procedure outlined in sec. 77 of the Civil Practice Act. The engineer, fireman and brakeman testified that a bright headlight was showing for the crossing; that the automatic bell was ringing on the engine at the time; and that the engineer whistled for the crossing all the way up to it from about 1,500 feet back. Under sec. 68 of the Civil Practice Act [Ill. Rev. Stat. 1949, ch. 110, par. 192; Jones Ill. Stats. Ann. 104.068] judgment may be entered on the return of the verdict. Either party may move for a new trial or in arrest of judgment or for judgment notwithstanding the verdict. He may do so before the final judgment is entered or within 10 days thereafter, or

within such time as the court may allow on motion made within such 10 days. In our opinion the fact that the judgment was entered on return of the verdict and prior to the filing of the motion for a new trial does not affect the discretionary power of the court to grant a new trial. In *Gavin v. Keter,* 278 Ill. App. 308, the court said (315):

''If judgment had been entered upon the verdict and the appellees were here claiming that the evidence did not warrant the verdict, the question of the preponderance of the evidence would not arise in this court and we would not be warranted in disturbing the verdict of the jury unless the verdict was clearly against the manifest weight of the evidence. But under the new Practice Act, . . . this appeal concerns the action of the trial court in granting a new trial. A trial court has more latitude than this court in passing upon the verdict of a jury. The allowance or refusal of a new trial on the weight of the evidence is peculiarly within the discretion of the trial court and he is warranted in granting a new trial if a plaintiff has failed to sustain his claim by a preponderance of the evidence. In passing upon the question as to whether or not the trial court in such case was justified in granting a new trial, we must bear in mind that there are many things which a trial judge observes on a trial that do not appear from the printed record,—the appearance of a witness, his or her manner in testifying, and other circumstances that greatly aid the trial court in determining the credibility of a witness and the weight, if any, that should be attached to his or her testimony. After a careful consideration of the oral and documentary evidence in this case, we have reached the conclusion that we would not be justified in setting aside the order of the trial court granting the defendants (appellees) a new trial.''

In *Barthelman v. Braun,* 278 Ill. App. 384, the court said (388):

"The trial court is given discretion in passing upon a motion for a new trial and it is the duty to carefully weigh the evidence, and if it is his judgment that the verdict of the jury is not in accord with the weight of the evidence, he should grant a new trial. The trial court is generally in a better position to pass on the weight of the evidence than the Appellate Court, because he has the opportunity to see the witnesses and observe their conduct and demeanor while on the witness stand."

In *Parke v. Lopez,* 306 Ill. App. 486, the court said (490):

"In granting motions for a new trial, it is largely discretionary with the trial court whether he shall, or shall not grant the same. In the present case it seems to us that the trial court properly exercised his discretion and granted the plaintiffs a new trial."

In *Lepkowski v. Laukemper,* 317 Ill. App. 304, the court said (314):

"A court of review will not interfere with an order granting a new trial based on disputes as to the facts, unless the record shows a clear abuse of discretion."

See also *Sedgwick v. Sedgwick,* 322 Ill. App. 278 (Abst.). After carefully reading the transcript of the testimony we cannot say that the trial judge abused his discretion in granting a new trial.

Plaintiffs maintain that the testimony of the engineer called as a witness by plaintiffs made out a prima facie case of wanton misconduct on the part of the defendant Bilthuis, and that the court erred in directing a verdict in favor of defendant at the close of plaintiffs' evidence. In apt time plaintiffs filed a motion for a new trial as to Bilthuis and such motion

was subsequently denied. The charge against Bilthuis was that he was guilty of wilful and wanton misconduct. At the time the verdict was directed in his favor there was in the record the testimony of the engineer that the train approached the crossing with the headlight burning, whistle sounding and bell ringing. If that were true, then since Bilthuis had an unobstructed view of the track for over 1,500 feet, there was evidence that might warrant the jury in finding him guilty of wilful and wanton conduct in traveling upon the crossing and subjecting plaintiffs to injury. Bilthuis states that reasonable minds could not differ that his conduct, characterized under oath by plaintiffs as blameless, was not wilful and wanton. Our view is that there was evidence to make out a prima facie case of wilful and wanton misconduct against Bilthuis. He also asserts that if there is found any evidence in the plaintiffs' case of wilful and wanton conduct on his part, then on the same evidence the plaintiffs were guilty of the same misconduct and the trial court properly directed the jury to return a verdict finding him not guilty. The opportunity of Miss Marchese, who was in the rear seat, to observe was not equal to that of Bilthuis. That Miss Chapman in the front seat had an equal opportunity to see the headlight, is a factual assumption. A driver synchronizes his speed to the time, place and duration of his observation, not to that of his passenger. The car is responsive to the driver's will. Consequently, the driver is enabled to make his observation at as slow a speed as he finds necessary, and the observation and the slow speed can both be prolonged until he is satisfied. Not forewarned as to what will be the minimum speed, nor the duration of it, the passenger makes his observation under difficulties. It is disconcerting to a driver to have a passenger suggest how he shall drive. Unless the passenger sees an obvious danger which the driver might not see, there

501

would be no duty on the passenger to warn the driver. In the instant case neither the passengers nor the driver saw the train until they were a few feet from it. Miss Chapman testified that she had seen Bilthuis look for a train. She had a right to assume that he was looking carefully and to relax her own diligence accordingly on the assurance that he was watching out for her safety. She was a passenger, having no control over the operation of the automobile. In *Dees v. Moore,* 335 Ill. App. 318, the court cited with approval (325) the case of *Clarke v. Connecticut Co.,* 83 Conn. 219, where that court said:

" 'What conduct on the passenger's part is necessary to comply with his duty must depend upon all the circumstances, one of which is that he is merely a passenger having no control over the management of the vehicle in which he is being transported. Manifestly, the conduct which reasonable care requires of such a passenger will not ordinarily, if in any case, be the same as that which it would require of the driver. While the standard of duty is the same, the conduct required to fulfil that duty is ordinarily different because their circumstances are different.' "

In *Rhoden v. Peoria Creamery Co.,* 178 Ill. App. 452, the court said (465):

"A passenger riding as an invited guest in an automobile is only required to exercise such care as the exigencies of the situation required; in other words, such guest is bound to use such care and caution as a person situated in like circumstances would exercise. *Fredericks v. Chicago Rys. Co.,* 208 Ill. App. 172, and the fact that the defendant in error did not do or say anything as the car approached the truck did not, in our opinion, show, as a matter of law, that she was not in the exercise of ordinary care for her own safety. The question of whether she did or failed to do all that a

reasonable person in like circumstances would have done was properly submitted to the jury by the trial court."

We are of the opinion that the court erred in directing a verdict for Bilthuis. For the reasons stated the judgment of the superior court of Cook county is reversed and the cause remanded with directions to proceed in a manner not inconsistent with the views expressed.

*Judgment reversed and cause remanded with directions.*

LEWE, P. J., and KILEY, J., concur.