Leonard Garrett, Plaintiff-Appellee, v. S. N. Nielsen Company, a Corporation, Defendant and Counter-claimant-Appellant, v. Gateway Erectors, Inc., a Corporation, Defendant and Counterdefendant-Appellee.

Gen. No. 49,143.

First District, First Division.

June 8, 1964.

Lord, Bissell & Brook, of Chicago (Gordon R. Close, J. M. Smyser and R. C. Valentine, of counsel), for appellant.

Peterson, Lowry, Rall, Barber & Ross, of Chicago (A. R. Peterson, Harold W. Huff, and William E. Rattner, of counsel), for Gateway Erectors, Inc., appellee. John J. Sullivan, of Chicago (John J. Sullivan, Frank J. Wiedner, and William J. Harte, of counsel), for Leonard Garrett, appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action, in which the jury returned a $75,000 verdict against defendant S. N.

Nielsen Company, and a not guilty verdict for defendant Gateway Erectors, Inc. Nielsen's counterclaim against Gateway had been severed from the trial of plaintiff's case, and on the basis of the jury verdict in plaintiff's case, the trial court entered findings of fact and judgment in favor of Gateway. Defendant Nielsen appeals from both judgments.

As to plaintiff's case, defendant Nielsen requests that it be granted judgment notwithstanding the verdict, arguing "there was no basis on which the jury could have found this defendant liable," or that it be granted a new trial because of prejudicial trial errors. In the alternative, Nielsen requests that the judgment on the counterclaim be vacated, and that "judgment be entered in favor of this defendant on the counterclaim in the. amount of the plaintiff's judgment against this defendant." There are no cross-appeals and no contention of contributory negligence of plaintiff.

Plaintiff, Leonard Garrett, was injured on November 28, 1960, when a piece of shoring, known as a "New York shore," fell from the sixth floor of a building under construction and struck him while he was engaged in laying pipe in a trench alongside the building. The "New York shore" provides the bracing or support for the "U"-shaped plywood shell or trough-like forms into which steel and concrete are placed and poured to make reinforced concrete beams. The bottom of the plywood form is called a "beam bottom," and the two sides are called "beam sides." The shores are "T"-shaped, made of wood, and placed at 2-foot intervals under and supporting the "beam bottoms." Each shore has a vertical 4 x 4, topped with a horizontal 4 x 4 bar, and a 2 x 6 entending on an angle from the vertical 4 x 4 to the horizontal 4 x 4 crosspiece. It was estimated that the shore weighed about 75 pounds.

Plaintiff, then thirty-three, was an employee of the M. J. Corboy Corporation, one of the subcontractors employed in the construction of a series of seven buildings, known as the Henry Horner Project, in Chicago, Illinois. Defendant Nielsen was the general contractor on the project, and its carpenter employees had previously installed the shoring that fell. Defendant Gateway Erectors, Inc., was a subcontractor "for certain ironwork to be performed on the job site."

The testimony regarding plaintiff's injuries is uncontradicted, and no point is made on appeal that the award of damages is excessive. Plaintiff was in good health prior to injuries. At the time of trial, his life expectancy was 32.3 years. Plaintiff sustained permanent "compression-type" fractures of the cervical vertebrae and a skull fracture. This resulted in constant headaches and dizziness, which prevent plaintiff from bending, driving vehicles, and other activities, including heavy work, which were the type plaintiff had been trained to perform. A specialist testified that the persistence of plaintiff's condition indicated that it probably would be permanent.

Initially, we consider defendant Nielsen's contention that "in the absence of any probative evidence tending to establish that this defendant was negligent and that such negligence was a cause of the plaintiff's accident, the trial court should have directed a verdict." Defendant's motion for a directed verdict at the close of all the evidence presented the single question whether there was, in the record, any evidence which, standing alone and taken with all its intendments most favorable to plaintiff, tended to prove the material elements of his case. Evidence favorable to plaintiff's case was all that could be considered by the trial court in this inquiry. If there was a total failure to prove one or more of the essential elements of the plaintiff's case, specifically, as

426

contended by defendant Nielsen, negligence on its part, the motion should have been allowed. (Moss v. Wagner, 44 Ill App2d 180, 194 NE2d 481 (1963); Stankowitz v. Goldblatt Bros., Inc., 43 Ill App2d 173, 193 NE2d 97 (1963).) The court may not consider conflicts in evidence, its weight or preponderance, or the credibility of witnesses, but may consider only that evidence which is most favorable to the party against whom such a motion is directed, together with all reasonable inferences that may be drawn therefrom. Battershell v. Bowman Dairy Co., 37 Ill App2d 193, 197, 185 NE2d 340 (1962).

Defendant Nielsen asserts that all the testimony as to the negligence of Nielsen represents only "conjecture and surmise," that it is just building "inference upon inference." However, as stated by Mr. Justice Friend in Grand Trunk Western R. Co. v. M. S. Kaplan Co., 43 Ill App2d 230, 242, 193 NE2d 456 (1963), in discussing the rejection of "sequential inferences" (an inference upon an inference):

> "Such a sweeping exclusionary formula is of doubtful analytical value in the decisional process. It serves only as a convenient repository for rejected inferences. . . . The pertinent consideration is whether the inference based on an inference is reasonable."

We believe there is merit in that approach here, and the instant situation calls for the application of the pronouncements in Lavendar v. Kurn, 327 US 645 (1946):

> "Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only

where there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."

This language was cited with approval by our Supreme Court in Lindroth v. Walgreen Co., 407 Ill 121, 133, 94 NE2d 847 (1950), where the court also stated that "the focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury."

The testimony in the record on the question of defendant's negligence discloses the following: Archie Smith, general superintendent for Nielsen, testified that "the upper portion of this New York shore is affixed to what we call the beam bottom and is nailed to it and also to the inside kicker. We use a couple of nails to attach the shore to the beam bottom. More nails are used to attach the New York shore to the kicker . . . . Across each of the top or horizontal portions of this support, between the cantilever and the existing structure, you have the beam bottom that is put in and spiked with spikes. You would use 16-penny sized nails for that purpose. Sixteen penny would be, I imagine, four and a half to five inches. . . . Better than an inch and one-half of the nail is protruding into the 4 x 4 roughly, I would say."

On this point, Phillip Shoevlin, an ironworker foreman for Gateway Erectors, testified that upon hearing of the occurrence he went to the spot where plaintiff was lying. He observed "one shore lying off to my right facing the building . . . . The shore was on the dirt piled up right outside the ditch where he was lying, approximately. [Then] I looked up. There was one spot where a shore was missing, directly above a trench where they were digging a hole in the wall, directly above where Garrett was in the trench. That was the 6th floor. . . . I went up to the 6th floor but could not necessarily determine what caused it to

428

fall. . . . I examined the place where the shore had been. . . . And I looked at the beam bottom where the shore was missing, and there were two nails sticking out of the beam bottom, sticking straight down parallel to each other and the nails were already rusty. . . . I went up to the 6th floor within a few minutes after this injury occurred. My observations were made within 5 or 6 minutes after the accident occurred, approximately. The nails were rusty. These were the nails coming through the beam bottom. They were in approximately in place where the New York shore would have been. That is how the New York shore is fastened to the bottom." The witness answered affirmatively to the question whether the rusty nails indicated that the nails had not engaged any piece of wood for a long period of time. The witness added. ". . . a nail at least overnight, if it was out and exposed to weather, it would rust, but not within ten minutes."

Russell Hess, superintendent for structural iron-workers at Gateway, testified he went to the scene of the occurrence the next morning, accompanied by Mr. Shoevlin. He stated, "I observed one shore missing on the floor above the floor we were working on. I made an examination at the point where that shore was missing. It revealed that it had been pulled out and set aside. I observed the beam bottom. There were two spikes, sixteen pennys in it. They weren't bright and shiny like they had been just removed. They were tarnished . . . . By 'tarnished' I mean becoming rusted. These nails were on the underside of the beam bottom protruding straight down. They weren't exposed to rain or anything like that. By 'long standing' I mean a matter of three or four days. With regard to the nails, I don't think they'd [Nielsen] use a rusty nail. I don't know this of my own knowledge. . . . they usually use new nails. I never saw a nail with tarnish on it."

Frank Romanelli, who was a carpenter-superintendent for the Nielsen Company at the time of the occurrence, was called by the plaintiff. He testified that he did not see the incident but went to the building immediately afterward and observed, "There was only one missing shore. I looked down to see where the shore was. It was on the excavation at the place where the laborer or plumber, whatever the man was below, had thrown it out of the ditch. It was lying on the dirt that was piled next to the ditch where Leonard Garrett was working. . . . I noticed nothing else unusual about the shores up there. They were all in good condition. . . . [I] looked up at the spot. The nails were all right. They were bent a little. I couldn't say whether they were rusty."

██ We believe the testimony in this record, when considered with all reasonable inferences from it in its aspect most favorable to plaintiff, permits a reasonable basis for finding negligence on the part of defendant Nielsen. A jury might reasonably conclude from the evidence that the two nails driven into the top of the shore were to align and lock the shore into place. The jury might further conclude that the two rusty nails indicated that the instant shore had been negligently installed, and that the shore fell of its own weight or, as later discussed, by the routine shaking of the beam side by a Gateway employee.

██ We believe also that a jury might reasonably conclude that defendant Nielsen, the general contractor, failed to provide adequate safeguards to prevent injury to plaintiff from falling objects. Every person owes to all others a duty to exercise care to guard against injury which may naturally flow as a reasonable, probable and foreseeable consequence of his acts, and the law is presumed to furnish a remedy for the redress of every wrong. The duty to exercise ordinary care to avoid injury to another can extend to remote

430

and unknown persons. (Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836 (1955).) The creator of conditions dangerous to workmen must be held to a standard of conduct for the protection of such workmen in accordance with the attendant circumstances and conditions. The construction of the reinforced concrete beams required the use of numerous "New York shores" in the constant assembling and reassembling of the forms into which the concrete was poured. These shores were uniformly placed close to the perimeter of the floors, and because of top-heavy construction, we think it reasonable to infer that almost any degree of negligent installation or use would result in the shore falling outward and down along the side of the building, striking any workmen below, in the absence of any net or safeguarding device. The jury might have reasonably concluded, from contested testimony that nets have been used on similar projects, that Nielsen should have provided nets or taken some means to prevent similar occurrences. "A custom or usage cannot alter or change the standard of conduct required by law, and the fact that a thing is done in the usual way does not furnish excuse for a failure to exercise proper care or for negligent conduct." 28 ILP, Negligence, § 26; McNealy v. Illinois Cent. R. Co., 43 Ill App2d 460, 470, 193 NE2d 879 (1963).

Defendant Nielsen also argues that the only negligence which appears in this record is that of defendant Gateway. Frank Romanelli, Nielsen's carpenter-superintendent, testified that on the day of the occurrence he was inspecting building #1, when he looked toward building #2, and he observed an iron-worker who was shaking the beam side very violently. He ran to the worker and "laced him down for what he was doing to that shore, one shore had been knocked out because of the violent movement of the temporary

outside beam side." He further testified that he "saw an ironworker grab the top portion of the beam side. He shook it, got hold of it and just started shaking it and shaking it . . . ." The witness said he believed that the reason the ironworker shook the beam side so violently was to pull it out on the deck to place inserts on the beam side. He said when he went to scold the ironworker he didn't know there was an accident. He further stated that all of the other shores were in the proper position following the occurrence.

Phillip Shoevlin, Gateway foreman, testified that his men put the cast steel inserts on the beam side and the inserts are not attached before the beam sides are put up. He described the procedure: "There was primarily one individual who was engaged in this particular chore, that was Jim Slechta. It was necessary for him to remove the beam sides to insert these; it was easier; it was awful rough. The distance of the beam was too narrow to swing a hammer. It was easier to take it out and lay it on the deck."

James Slechta, Gateway's employee, testified that he was working on the seventh floor of building HR2, placing inserts in the beam sides. He recalled that a man was injured, working in the ditch below. He did not see the New York shore fall from the sixth floor of the building. He further testified, "After this accident occurred, Mr. Romanelli came up to the deck and had a conversation with my boss. The conversation had something to do with the beam sides, I believe. When he came up on the deck, he started shouting and wasn't talking to anyone in particular . . . . He said something fell and hit a man below. . . . This was a heated conversation. He was mad. . . . I worked on the whole side, and directly over this ditch. I was removing beam sides from that side of the building. I presume that the beam bottoms that day were nailed to the New York shores. I did not

notice anything unusual about them." He answered "Yes," when asked if he found it necessary, on that morning, to shake the beam sides. He testified that prior to his use, the carpenters lay the beam sides on the beam bottoms and some of them overlap. "I found it easier if one is overlapping another and I have my hands on this one to flip this one and this one will flip over that way, and I can remove it but I can't remove both at the same time. That is what I referred to when I said shaking. . . . That was the same procedure we used throughout the project up to that time."

Russell Hess, superintendent for Gateway, further testified that the ironworkers put the inserts on the beam sides and "to put the inserts on the beam side we laid them up onto the deck, butted them together, picked them off and nailed the insert onto it on the deck. The inserts were supposed to be nailed onto the beam sides before the beam sides were put on top of the beam bottoms. We didn't remove the beam sides from the beam bottoms; they weren't nailed in place; they were set in there loose. If they were wedged in place, my men did not remove them. As a matter of fact it was not the ironworker's job at all to have anything to do with either the New York shores, the beam sides or the beam bottoms. That was a carpenter's job. . . . If it [beam side] was attached to the shore and shaken and the shore fell, that would tell me, based upon my experience, that the shore wasn't secured properly. In order for shaking to do something to the shore, if it was attached properly, and the beam side attached to it, it would have to be something tremendous."

█ On this point, we conclude the evidence before the jury was conflicting as to whether Slechta, Gateway's employee, violently shook the beam side, causing the shore to fall, or working in routine fashion,

433

he "flipped" over the beam side, which provided motion to permit a negligently installed shore to fall. We believe there was sufficient evidence for the jury to reasonably conclude either that the activities of Gateway's employee did not contribute to the occurrence or, if so, the activities were of a routine nature and performed with due care.

We hold there was sufficient evidence in the record to justify the submission to the jury of the issue of defendant Nielsen's negligence, and we find that the trial court was correct in denying defendant's motion for judgment notwithstanding the verdict. Also, we conclude that the instant verdict is supported by the evidence.

 The final contentions of defendant Nielsen refer to prejudicial trial errors. Defendant contends that the trial court committed prejudicial error in allowing opinion testimony based on speculation. The objection was made to a question concerning the duration of the rust on the nails. The determination of whether an alleged expert is qualified is largely within the discretion of the trial judge. (18 ILP, Evidence § 322.) We find no abuse of discretion in the court permitting Shoevlin, an ironworker with 14 years' experience in the construction field, to give an opinion on metal rusting. Nor do we find error in the court's refusal to permit an attempted impeachment of Shoevlin, when he was questioned about a conversation with Romanelli immediately after the occurrence. Shoevlin answered that he did not recall the conversation, but did recall giving a deposition. Defendant complains of the refusal of the court to "hear any discussion of why the contents of the deposition were impeaching." We have examined the "impeaching statement" and fail to find "a real inconsistency between the two assertions of the witness." 3 Wigmore, Evidence, § 1040, p 725.

434

Defendant also complains of the verdict forms submitted by the trial court to the jury. Three forms were submitted under which the jury could have found against the two defendants jointly or against either individually, but the trial court refused to submit a verdict finding both defendants not guilty. The trial court remarked, "Well, there would be no reason for the jury to find that some unknown person tampered with the situation, because there isn't an iota of evidence to that fact, and even if they decided that the wind came along and blew it down, it would still be somebody's responsibility, namely Nielsen's, to put it up securely enough that the wind wouldn't or couldn't blow it down, so I can't conceive of any situation where both defendants here would be not guilty, and I am not going to give them that kind of a verdict because, as I said, I couldn't sustain it if it was." Also, the record indicates that both defendants proceeded on the theory that the other was solely responsible for the occurrence and not some unknown person.

█ █ We agree that "in drawing verdict forms care must be taken to insure that they cover every possible finding the jury may make under the evidence from the point of view of each plaintiff and each defendant." From the remarks of the trial judge, it is obvious that the court believed "the only question for the jury to decide is which one of the defendants is guilty, or all, and the amount of the damages." (Krump v. Highlander Ice Cream Co., 30 Ill App2d 103, 106, 173 NE2d 822 (1961).) Although there were 39 subcontractors at work on this project, "there isn't an iota of evidence" in the record that any other contractors, other than defendants, had anything to do with the instrumentality causing plaintiff's injuries. We find no error here.

Finally, we conclude there is nothing in this record to justify the granting of a new trial or the entering

of judgment on the counterclaim in favor of Nielsen and against defendant Gateway in the amount of plaintiff's judgment against defendant Nielsen.

For the reasons given, the judgment for plaintiff and against Nielsen and the judgment in favor of defendant Gateway on the counterclaim are affirmed.

Affirmed.

BURMAN and KLUCZYNSKI, JJ., concur.