PATRICK J. MILLETTE, Plaintiff-Appellee and Appellant, *v.* THOMAS J. RADOSTA *et al.*, Defendants-Appellants and Appellees.—(THOMAS J. RADOSTA, Cross-Plaintiff-Appellee, *v.* CHRYSLER CORPORATION *et al.*, Cross-Defendants-Appellants.)

First District (4th Division)   No. 78-1845

Opinion filed April 24, 1980.

6

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Stanley J. Davidson and William J. Furey, of counsel), for appellants Chrysler Corporation and Des Plaines Chrysler-Plymouth Sales, Inc.

Frank Glazer, Ltd., of Chicago, for appellee Thomas J. Radosta.

Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago (Noel C. Lindenmuth and Maureen A. Mitchel, of counsel), for appellee Patrick J. Millette.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The plaintiff, Patrick J. Millette, injured in an automobile accident, sued the driver of the other vehicle, the manufacturer and the dealer of the car. The driver counterclaimed against the other defendants for the loss of the vehicle. The jury returned a verdict for the plaintiff and against all defendants and for the driver and against the manufacturer and dealer. All the defendants have appealed.

The occurrence giving rise to this litigation took place on December 6, 1972, in the southbound lanes of the Calumet Expressway. At the point of occurrence the Calumet Expressway consists of three southbound lanes with a guardrail separating the southbound lanes from the median strip and the northbound lanes.

The plaintiff was driving a Ryder trailer truck in the center lane. Defendant, Thomas Radosta, was driving a 1972 Plymouth Cricket manufactured by Chrysler Corporation (Chrysler) and sold by Des Plaines Chrysler-Plymouth Sales, Inc. (Des Plaines), in the center lane behind the plaintiff. Radosta decided to pass plaintiff's truck by leaving the center lane and proceeding in the left lane closest to the median strip. After leaving the center lane and beginning to travel in the left lane Radosta lost control of the automobile. The vehicle bounced off of the guardrail at least twice, collided with plaintiff's truck and knocked the tractor and trailer sideways on the expressway.

In count I of his complaint, the plaintiff alleged that Radosta was guilty of certain acts of negligence which proximately caused the accident

including, *inter alia*, failure to keep under proper control a vehicle which he knew or should have known contained a defect in the steering system which could cause loss of control of the vehicle.

In count II plaintiff alleged that Chrysler, the manufacturer, designed and distributed an automobile which was in an unreasonably dangerous condition when it left Chrysler's control.

Count III alleged that the dealer, Des Plaines Chrysler, had distributed and sold an unreasonably dangerous product.

In count IV plaintiff charged Des Plaines with neglience in failing to replace the defective component or warn Radosta not to drive the car.

Count V alleged that Chrysler was guilty of willful and wanton conduct in that it possessed actual knowledge that the rack rod and/or rack gear housing were defective yet did nothing to remedy the situation.

Radosta counterclaimed against Des Plaines and Chrysler alleging in count I that Chrysler and Des Plaines had distributed an unreasonably dangerous automobile to Radosta and in count II that Chrysler and Des Plaines were guilty of negligence in that they failed to warn Radosta that the steering system could fail prior to replacement of the recall parts; failed to advise Radosta not to drive his vehicle; failed to remove the defective components and replace them; failed to provide Radosta with a replacement vehicle.

## Millette's Case

The plaintiff called Thomas Radosta as a witness under section 60 of the Illinois Civil Practice Act.

He purchased a 1972 Plymouth Cricket in May 1972 from Des Plaines Chrysler-Plymouth. The vehicle, which did not have power steering, had 11,000 miles on it at the time of the accident.

The accident occurred on a clear, cold day as Radosta traveled south on the Calumet Expressway. There was no snow or ice on the traveled portion of the pavement, but there was an inch of snow and ice on the shoulder. The ice and snow did not extend more than a foot west of the east guardrail. From the time he began driving on the expressway on the day of the accident until the accident occurred he did not encounter deep chuck holes or fixed objects. A few months before he had hit a hole (or hill) which knocked the muffler off. However, until the accident occurred Radosta had not experienced any difficulty with the steering but had always found it responsive. Likewise, in negotiating a curve shortly before the accident and in changing lanes just prior to the accident, Radosta did not experience any difficulty with the vehicle. Plaintiff's truck, with which Radosta ultimately collided, was about 500 feet ahead of his vehicle in the center lane. Radosta was traveling 55 to 60 miles per hour, and the truck was traveling 50 miles per hour. There were no

vehicles in the left lane either ahead of or behind Radosta so he made a slight movement to the left with the steering wheel in order to move into the left (east) lane to pass the truck. Just as he attempted this movement, the car "took off to the left" at a 90-degree angle and almost made a left hand turn. Radosta did not hear anything unusual and had not made any motion to accomplish such a turn. The car was simply steering itself.

Radosta attempted to move the steering wheel but it would move only a half inch. The front of the Radosta vehicle hit the median strip guardrail, bounced off and veered toward the rear tire of plaintiff's trailer truck. He tried to apply his brakes and get control of the wheel, but the wheel could be moved only one-half turn to the left. The car did not respond right away but continued to approach the rear of the truck.

Then the car made another abrupt left-hand turn of approximately 75 degrees. This was not a result of his turning the wheel since he was turning it back to the right when it occurred. However he was able to turn it only a quarter of a turn. After that the wheel was substantially frozen in place.

The vehicle hit the guardrail a second time, bounced off and the right passenger side struck the front of plaintiff's truck. The Radosta vehicle was pushed by the impact and skidded southbound. The car came to rest partly on the shoulder and partly on the far right (west) lane and was facing west. The engine died, but Radosta had not turned off the ignition and had not changed gears. After the car came to rest on the right shoulder Radosta did not touch the key of the car again and did not make any attempt to turn the steering wheel. He just left the key in the steering column.

Radosta could not remember if the wheels on the car struck the ice and snow on the shoulder at any time during the occurrence. He denied that his wheels went up on ice and snow as he approached the truck. Radosta observed the vehicle on December 7 and December 8 but made no attempt to move the steering wheel. After December 8 he did not see the car again and at the time of trial did not know where the car was.

Over objection of Chrysler and Des Plaines the trial court admitted into evidence a Chrysler recall letter received by Radosta in August. The recall letter stated:

"Dear Customer:

Our records indicate that you have purchased a 1971 or 1972 Cricket which has the vehicle identification number appearing on the enclosed form. This letter is sent to you pursuant to the requirements of the National Traffic and Motor Vehicle Safety Act. We have determined that it is possible to damage the 'rack and pinion' steering system on your car if the car is subjected to particular road and driving conditions. Severe or repeated impacts of an unusual nature, such as hitting a large chuckhole or washout

at medium speed with the brakes applied, may cause a bend in the steering gear rack. Impacting high curbings in a severe manner may also cause a similar bend condition. Such repeated bending could increase steering effort, and that effort would be higher for left turns than for right turns. If left unattended, it could eventually result in a loss of steering control.

Since the possibility of damage has been established, however remote, Chrysler Corporation wishes to modify your vehicle so that such a problem cannot occur. Modified steering assemblies are being fabricated and will be supplied to dealers as rapidly as possible. While the condition may not be of immediate concern, it may occur, and we urge you to heed this notice.

Until parts are available, we ask that you pay particular attention to any increased effort you may encounter in your steering. If you feel that there is any problem, contact your selling dealer immediately and arrange for an inspection of your vehicle. He will make any adjustment or correction that may be necessary at no charge to you.

When the modified steering assemblies arrive at the dealerships, you will be contacted and an appointment will be arranged to replace the steering assembly on your car, again at no charge to you. It is expected that all parts will be at dealerships by September 30, 1972; if your dealer has not contacted you by this date, please contact him and make an appointment.

We regret the necessity for this corrective action and any inconvenience it may cause; however, we are taking this action in the interest of your safety and continued satisfaction with your vehicle.

We will appreciate your cooperation."

Radosta went to Des Plaines several days after receiving the letter and again about a month later in October but each time he was told they did not have the part in stock. He went back the Monday before the accident, was told the part was still not in stock but that they had checked the car, everything was all right, and Radosta should not worry about it. He was not told to cease driving it, and Radosta continued to use it because he thought there was no major problem.

Radosta could not recall being at Des Plaines on November 27, 1972, did not remember if he met with a Mr. John Lee, and could not recall whether he had talked to Mr. Lee about the steering on his vehicle.

Holloman, who had been driving southbound directly behind the plaintiff, testified that Radosta passed him in the left lane closest to the shoulder at an estimated speed of at least 65 miles an hour, proceeding

without any problem in a straight, orderly fashion. After passing Holloman Radosta's car went left toward the median. This did not appear to be a sudden movement, and at no time did he see the car make a 90-degree turn. It came back onto the highway. Holloman thought Radosta then had it under control because he went a few feet in a straight line. However the car then went to the left and hit the guard rail again. It came back out again, went back in and hit the guardrail for the third time. This time it came out and "clobbered" the plaintiff's truck.

Holloman testified that each time the car skidded, the wheels were cut in the direction of the skid, like the man knew what he was doing. However he could not see Radosta's hands.

Holloman also stated that the shoulder of the expressway was covered with one inch of ice and snow which extended all the way from the guardrail to the lane designation line indicating the eastern side of the lane. The ice did not cross the lane designation mark. When the car skidded off, it went onto the ice; however, when it came back on the highway, it was on dry pavement.

The plaintiff Millette testified that on the day of the accident he was driving his truck southbound on the Calumet Expressway at 50 miles per hour. While traveling in the center lane he glanced off to the left and saw the Radosta vehicle on the left shoulder heading straight out toward his truck. He saw Radosta tightly holding the steering wheel as if he was trying to steer, but did not see the wheel move. Within a split second the Radosta vehicle shot diagonally across the expressway and collided with plaintiff's truck. Plaintiff did not observe the Radosta vehicle strike any other object prior to striking his truck.

## RADOSTA'S CASE

Yankovich, an Illinois State Trooper who investigated the accident, testified, over Chrysler and Des Plaines' objection, that Radosta told him that it felt like his steering mechanism locked while he was operating the vehicle. Because of this statement Yankovich decided to test the steering of the vehicle. He tried several times to move the steering wheel to the right and the left but could not do so.

Dr. Carl Uzgiris, a registered professional engineer in Illinois, then testified for Radosta. He had designed racing vehicles, racing equipment, and mobile vehicles. He was familiar with what constitutes a defect in metal casting. He first inspected the automobile on February 16, 1973, and some of his testing was done at a later date. He did not know what had occurred to the vehicle from the day of the accident until his initial inspection.

Uzgiris dismounted the steering mechanism and removed its

component parts. He saw no signs that the mechanism had been tampered with or replaced. After the steering components were removed they were measured and examined visually and microscopically. Professor Higgins, the department chairman of metallurgy at IIT, assisted in evaluating the steering components. He examined the rack bar from a metallurgical point of view and prepared a report for Uzgiris. Various conclusions were made in Professor Higgins' report and the entire report was appended to Uzgiris' report as a basis for Uzgiris' metallurgical observations. Uzgiris drew similar conclusions. He denied that he was not qualified to formulate the conclusions or do the work done by Professor Higgins. He did discuss the findings with Professor Higgins and did rely upon them. Uzgiris concluded that all of the unusual damage that he noted could be related to the accident with the exception of the steering gear rack and pinion.

Uzgiris' findings concerning the steering components were:

1. The rack bar was bent in two places. It was bent downward .007 of an inch and bent forward .028 of an inch. Superimposed on the downward bend was a backward bend of .057. The two bends would be considered abnormal and would lead to mismating of the gear teeth and result in abnormal function of the gear teeth. Sometimes more effort would be required to move the teeth, and in the extreme the effort to move the teeth would be large.

2. At the apex of the bend on the rack rod the surface material was not smooth and heat discoloration was visible. The apex contained a band of pits and grooves which is equivalent to the situation which exists if one welds two pieces of rod together and then smooths it up by grinding. The pitted appearance of the rod would be characterized as a defect.

3. In the tooth portion of the rod there were longitudinal abrasions along the bottom tooth ends as if one attempted to file the teeth. Additionally, there was an irregularity of the left tooth corner on the left portion of the rack which is the area of the rack that mates with the pinion upon a left turn. The left corner of the tooth bottom would be considered a mechanical defect which reduced the lips on the teeth. The file marks appear to be attempts at filing down the lipped material. The net result was that the tooth corner is not smooth but ragged.

4. There was an abnormal wear pattern where the pinion teeth make contact with the rack teeth and was concentrated in the area where the pinion teeth mate with the left corner of the rack teeth. Rather than engaging the entire tooth surface only the corner of the rack teeth was engaging and carrying the load and as a result the

teeth were being pitted and gouged as contact was being made. The mating between the pinion gear and the rack teeth was abnormal and would lead to uneven meshing of gear teeth. The force needed to be overcome as the gears moved would vary irregularly. With the teeth misaligned there was no longer a proper mating of the surfaces and there was a possibility that the teeth might catch.

5. Fifty per cent of the housing was cracked. In order to examine the fractured surface Professor Uzgiris sawed the housing in half. Upon examination of the fractured surface he found a casting defect. The defect which was observed is sometimes referred to as a "cold shut" and is an area of metal which has not fused properly so that a portion of the material is incapable of carrying a load. The casting wall is weakened. The cold shut area extended through 60 per cent of the thickness of the wall. The significance of the defect was that it would weaken the housing so that it would fracture and fail at lower loads than normal. The housing area carries substantial loads that are carried by the rack rod. If the housing material is insufficient the housing may be torn away from the rest of the steering gear.

The purpose of the housing is to house the mating rack teeth and pinion and for proper function the teeth must mate properly. Proper mating is maintained by the housing restraining the two pieces and if the housing is cracked it can no longer maintain proper orientation of the two gears resulting in irregular meshing.

The new housing developed for the automobile had reinforced ribs which were not present on the housing which existed in the Radosta vehicle.

6. The rack rod in the Radosta vehicle was 7/8 of an inch in diameter whereas the replacement rack rod was one inch. The capability of a rack bar to resist bending is a function of the thickness of the rack bar material. Thus, a rack rod which is 1/8 of an inch thicker would be stiffer and resist bending more than the thinner bar. The thicker bar would be 70 per cent stiffer.

In response to an hypothetical question he stated the vehicle was defective as far as the housing and rack assembly were concerned. He further stated that these conditions could have been present prior to the accident and if present could have caused a loss of steering by binding. However, he repeatedly stated that he could not say whether the bending and cracks were present at the time of impact or not and that it was not possible to make a scientific conclusion as to when the fracture in the rack housing occurred. He also stated he was never advised that Radosta

experienced steering difficulty prior to the accident but assumed that the vehicle was capable of steering at the time of the accident.

At the conclusion of Uzgiris' testimony Chrysler and Des Plaines moved that his testimony be stricken in its entirety for three reasons:

1. There was no evidence that the condition of the vehicle immediately after the accident was the same as its condition on the day of Uzgiris' inspection.

2. Uzgiris improperly testified based upon Professor Higgins' metallurgical conclusions which were hearsay.

3. Uzgiris admitted that he did not know whether the defects he found caused the accident or were caused by the accident.

The motion was denied.

Arroyo, the owner of Princeton Auto Sales, a used car lot and body shop, testified that the Radosta vehicle was towed to Princeton in December of 1972 or January of 1973. The vehicle was stored in a locked vacant building on the premises. During the time the auto was stored with Princeton there were at least three inspectors on the premises who viewed the automobile. Arroyo did not know the identity of any inspector other than Uzgiris and although he thought there were three inspectors who looked at it there could have been other inspectors while he was not on the premises. He could not recall if any of the inspectors inspected the vehicle before or after Uzgiris inspected it.

Perry, an appraiser, examined Radosta's car on December 11, 1972, at the time it was at Wes' Towing Service. He testified that the market value of the car prior to the accident was $1,775 and that in its damaged condition it was worth about $50 in salvage.

Haeger, the president and general manager of Des Plaines, was called as an adverse witness. He testified that the vehicle was sold on May 9, 1972, and at the time of the accident was worth approximately $2,000.

The 1972 Plymouth Crickets were subject to a recall campaign. The first notification of the recall was received in the early part of June. When the recall campaign began the dealership did not have any control system set up for the customers concerning parts availability. Haeger did not notify any Cricket owners of the recall. Additionally, the dealership did not have anyone specifically assigned to handle telephone inquiries from people relative to the recall and there was no directive from his office as to where any inquiry should be forwarded. There was no policy set up for the situation which arose when a customer brought his automobile into the shop for replacement parts under the recall and the parts were not available.

John Lee was a Chrysler employee who worked at the dealership as a Service Development Specialist. He was not employed by the dealership.

As far as Haeger was concerned Lee and Chrysler were in charge of the recall campaign.

## CHRYSLER'S CASE

John Lee testified that in the fall of 1972 he was the Service Development Specialist with Chrysler and in that capacity was working at Des Plaines. He assisted the dealership in administering the recall and it was his responsibility to insure that the recall campaign was administered pursuant to Chrysler policy and Federal mandates. With respect to the recall campaign and replacement of parts, the mechanics at the dealership were operating under his supervision.

The owners of vehicles were notified of the recall by certified letter from Chrysler. Three attempts would be made to notify a customer in this fashion. Additionally, Mr. Lee had instituted a recall procedure at the dealership whereby the owners would be contacted no less than three times by telephone. Radosta was not contacted three times because his car was destroyed before the parts were received.

A repair order indicated that Lee inspected Radosta's vehicle on November 27, 1972. At that time the owner informed Lee that his steering was operating properly. If the steering had not been operating properly, Lee testified the vehicle would have been kept. However, he also stated that he did not remember meeting Radosta.

Lee could not actually see Radosta's rack rod because it was enclosed inside the housing. However, a bent rod would create difficult steering and the car did not have difficulty steering so it was his assumption that the rod was not bent. There are degrees of bending of a rod and a rod may be bent but may not be interfering with steering. He admitted that the housing could have been cracked at that time.

It was not Lee's responsibility to order replacement parts nor was it anyone's responsibility at the dealership. Replacement parts were shipped from England to Chrysler and then distributed in a ratio relating to the number of cars sold at each dealership. The replacement parts were shipped without any ordering being done by the dealership, and thus, the dealership had no control over receipt of the parts.

Lee learned of the accident on December 7, 1972. He examined the car, turned the ignition key to unlock the steering column and turned the steering to the left and right as far as it would go. He determined that it was not any harder to turn to the left or the right; that the steering did in fact turn; that the wheels were in fact turning and to the best of his knowledge he turned the wheel to the fullest extent possible. He further found that all of the steering parts were connected to each other. Consequently Lee determined that the steering gear was not at fault

because it did not bind or stick. He could not locate any other causes and telephoned Radosta and informed him that the vehicle had been inspected and no mechanical failure had been found to cause the accident and that Chrysler would not replace the car as demanded.

Kenneth Kuschell, a metallurgical engineer employed by the Chrysler Corporation as Senior Materials Development Engineer, testified that as a metallurgical engineer he examined failed parts and was responsible for the metallurgical input to the recall campaign. He conducted testing of a rack bar assembly received from a Canadian vehicle to see why the parts failed. His conclusion was that the Canadian vehicle failed as a result of severe overload. The housing also indicated that the failure resulted from impact damage which was probably caused from the rack bar running into the housing and fracturing it. As a result of his examination Kuschell recommended that: the rack rod size be increased from 7/8 of an inch in diameter to one inch in diameter; the material be changed to a stronger type of steel; the rack bar teeth be hardened by a process known as induction hardening. He did not recommend any modification of the rack housing.

Kuschell examined the rack rod and housing from the Radosta vehicle. The fracture in the housing was an impact fracture which is a fracture produced by rapid application of a load at one instant causing destruction of the part. In any event, the fracture in the housing could not have caused bending of the rack bar because pieces of the housing would not be displaced enough by the crack to cause a load on the bar and additionally, the strength of the housing is about one third the strength of the bar. Kuschell also stated that he had no way of dating when the fracture occurred. It could have occurred before the accident or it could have happened at the time of impact.

In Kuschell's opinion the bend in the rack bar and the fracture of the housing were caused by an overload. It would take 850 pounds of pressure to permanently deform the bar and a vehicle striking a guardrail or a truck at 60 or 65 miles per hour would generate loads far in excess of 850 pounds.

The last witness was John Agar. Agar was employed by Chrysler as an engineering supervisor in the Steering and Suspension Development Department. He was responsible for the development of steering components for domestically manufactured Chrysler passenger vehicles and had that responsibility since 1964. He was involved with the investigation which led up to the recall of 43,000 Crickets and was responsible for the Steering and Suspension Engineering Department's participation in the investigation.

He first gained knowledge of a problem when he learned of the failure of a steering gear on a Canadian Cricket. He received the parts of

that field failure in February 1972 and performed visual inspections of them. After performing visual inspections the parts were submitted to the metallurgical department of Chrysler Engineering. It was determined that the materials and processing were in accord with Chrysler's specifications.

Shortly thereafter Chrysler embarked upon a full scale investigation in order to determine how such a failure could have occurred. Agar was able to duplicate the result when he personally took a Cricket automobile and went outside on public roads and found an extremely rough railroad crossing. He drove the vehicle over the extremely rough road at 30 miles per hour with the brakes applied. The rack bar bent forward and upward around its engagement with the pinion gear. Chrysler was also able to duplicate the failures by parking the left side of the car very tightly against a curb and then turning the steering wheel to the right with the brakes on. Again, the rack bar was bent forward and upward. Agar conceded that an average man could put enough effort to run the wheel under those conditions; however, there was no information in the recall literature about being able to bend the rack bar when attempting to maneuver away from the parked position at a curb. Agar did not know why there was no mention of it in the recall literature.

Other Chrysler reports were discussed. One report stated that road tests on one automobile on a highway indicated steering was locked up on left turns. A report on another car indicated the driver stated that on a curve to the left when he attempted to turn left, the steering wheel would not turn properly. Another reported rack failure while driving slowly in traffic; another that the steering locked up a relatively short distance from the owner's home and the car slid into a parked car. There was no mention of hitting a pothole. Agar agreed that it would be possible to bend the rack bar on a single impact with a guardrail with the wheels turned to the right and the auto traveling at 60 m.p.h. Agar stated that the bending of the bar upward and forward in excess of .060 resulted in difficulty with steering. However, Chrysler never experienced a failure where the steering locked and would not be moved. Chrysler never encountered a situation where a slight turn to the left would result in the wheel locking and a total loss of control. Chrysler never encountered a situation where the wheel would turn only half a turn to the right and go no further. In fact Agar stated that a bent rack bar would cause harder steering but there would not be any loss of control. Based upon the testing Chrysler concluded that the original rack bar did not have sufficient strength to withstand severe forces imposed in certain limited types of driving occurrences. The result of the recall campaign was a change in the material specifications of the rack bar to a higher strength material, the purpose of which was to strengthen the rack bar. The strength of the

original rack bar was not sufficient to withstand the force of impacts with potholes or forces applied to it in static tests at curbing and prevent bending. Agar stated that the inability of the rack bar to withstand these forces was considered potentially hazardous and this dangerous condition existed in the auto at the time it left the control of the manufacturer.

The rack bar from the Radosta vehicle was bent in two separate places. There was never more than a single bend in any rack bar either under laboratory conditions or under Chrysler's own testing conditions. Additionally, the bends bear a reverse relationship to the manner in which bars were bent during Chrysler's testing. All of the field failures involved the bending of the rack bar forward and upward in the tooth area of the rack itself, not downward and forward or downward and to the rear as in the Radosta vehicle. Also there was never any bending to the right of the gear teeth. Based upon a hypothetical question Agar stated that in his opinion the vehicle did not experience any steering failure related to the recall campaign. He based this upon the assumptions that there was no steering difficulty up until the accident occurred, that the road surface was free of obstruction and that the brakes were not being applied when control was lost.

Agar further stated that the bends in the rack rod could have been caused by impact of the left front wheel. Additionally, Agar testified that the fractured rack housing in the Radosta vehicle would not cause any binding in the rack bar. Even though the housing was cracked the part was still essentially straight and there was not enough separation to prevent traversing of the rod through the housing.

At the close of all evidence plaintiff's motion for a directed verdict on the issue of plaintiff's contributory negligence was granted. Over objections of all defendants the trial judge also instructed the jury it must find for plaintiff and against "one or more of the defendants" and refused to submit a jury form allowing the jury to find all defendants not guilty. He fully instructed the jury as to the parties' contentions except as to contributory negligence of the plaintiff.

The jury returned a verdict for the plaintiff and against all three defendants. It also returned a verdict for Radosta and against Des Plaines and Chrysler. All three defendants have appealed.

On appeal Chrysler and Des Plaines contend:
  1. the trial court erred in admitting the recall letter;
  2. neither the plaintiff nor Radosta established a *prima facie* case;
  3. Uzgiris' testimony should have been stricken, did not establish a *prima facie* case but rather proved a case could not be established and finally that the evidence was prejudicial.

Radosta contends:
  1. the verdicts against and for him are inconsistent and cannot stand;

2. the court erred in failing to direct a verdict for him since any negligence by him was not a proximate cause of the accident;

3. this court erred in instructing the jury as to plaintiff's contention of negligence since there was no evidence to support each and every allegation;

4. the court erred in instructing the jury as to the statute prohibiting excessive speed;

5. the court erred in directing a verdict for the plaintiff on the issue of contributory negligence.

Radosta and Des Plaines and Chrysler all contend that the court erred in instructing the jury that it had to find in favor of the plaintiff and against one or more of the defendants.

## I.

### A.

Chrysler and Des Plaines contend that the trial court erred in refusing to exclude any evidence of the recall campaign. We disagree.

■■ ■ Obviously the recall letter was admissible as a prior statement made by a party opponent or its employee offered against that party at trial.[1] (*Farner v. Paccar, Inc.* (8th Cir. 1977), 562 F.2d 518.) Nor is the rule excluding evidence of subsequent repairs applicable. First, literally it does not apply because the letter was not an aftermath of the accident. (*Barry v. Manglass* (1976), 55 App. Div. 2d 1, 389 N.Y.S.2d 870.) Second, the purpose behind the rule, namely that public policy mandates the exclusion since otherwise persons would be discouraged from making repairs, is inapplicable since the recall of defective vehicles is not voluntary but mandated by Federal statute. (*Barry v. Manglass* (1976), 55 App. Div. 2d 1, 389 N.Y.S.2d 870; *Carey v. General Motors Corp.* (Mass. 1979), 387 N.E.2d 583; *Farner v. Paccar, Inc.* (8th Cir. 1977), 562 F.2d 518.) Finally, evidence of post-accident repairs are admissible in Illinois in products liability cases. *Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354, *appeal denied* (1978), 71 Ill. 2d 607; *Cunningham v. Yazoo Manufacturing Co.* (1976), 39 Ill. App. 3d 498, 350 N.E.2d 514; *Biehler v. White Metal Rolling & Stamping Corp.* (1975), 30 Ill. App. 3d 435, 333 N.E.2d 716; *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749, *appeal denied* (1972), 52 Ill. 2d 597.

Chrysler and Des Plaines contend, however, that the recall letter was only admissible if the plaintiff had first independently proven by expert testimony that the potential defect that was the subject matter of the recall existed in the vehicle at the time of the accident, the letter only

---

[1] The letter would be hearsay as to Des Plaines, but it does not appear that the party asked to have the jury instructed that the letter could be considered only against Chrysler.

being admissible to help prove that the defect existed when the vehicle left the manufacturer (*Carey v. General Motors Corp.* (Mass. 1979), 387 N.E.2d 583; *Manieri v. Volkswagenwerk A.G.* (App. Div. 1977), 151 N.J. Super 422, 376 A.2d 1317; *Fields v. Volkswagen of America, Inc.* (Okla. 1976), 555 P.2d 48; *Barry v. Manglass* (1976), 55 App. Div. 2d 1, 389 N.Y.S.2d 870), and that plaintiff failed to produce such evidence in this case. First we do not agree that such rule should be applied in this case. In several of the cited cases it appears that the letter indicated a defect might exist in some cars. Obviously in such instances the letter could not be used to make the transition from the general to the particular and to prove that the vehicle in question contained the defect. (*Landry v. Adam* (La. App. 1973), 282 So. 2d 590.) But it would be absurd to say that if a letter says all named vehicles without exception contained a defect, the plaintiff cannot use the letter as an admission that the named vehicle was in fact defective. It appears to us that there has been a confusion between proof the defect existed and proof the defect caused the accident. Here it is clear from the letter (as well as other evidence) that the rack bar did not have sufficient strength to withstand strain. This was the defect. Whether in fact this defective condition of the rack bar, its susceptibility to being bent, caused the accident could not have been proven by the letter. But this is more a question of the weight of the evidence and how the jury should be instructed. (Compare *Barry v. Manglass* (1976), 55 App. Div. 2d 1, 389 N.Y.S.2d 870.) Finally, even if we did accept the argument that the plaintiff must independently prove that the vehicle was defective, Uzgiris' testimony did in fact establish that the rack bar was too thin and thus more susceptible to bending. So did the testimony of the defendants' witnesses.

### B.

Chrysler and Des Plaines contend that the rule established in *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449, that a *prima facie* case that the product was defective and the defect existed when it left the manufacturer is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed to perform as reasonably expected was inapplicable since secondary causes, *i.e.*, Radosta's negligent driving at the time of the accident existed. They further contend that the plaintiff failed to establish a *prima facie* case since he failed to produce any expert evidence to support his cause of action.

Chrysler and Des Plaines cite no case for their assumption that a case in strict tort liability can, absent the *Tweedy* doctrine, be established only

through expert testimony. This is not the rule. The plaintiff may rely on direct or circumstantial evidence to establish his case or cn expert testimony (*Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338, *appeal denied* (1976), 61 Ill. 2d 602; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298, N.E.2d 289, *appeal denied* (1973), 54 Ill. 2d 596); indeed, expert testimony is merely one kind of circumstantial evidence. *Miller v. General Telephone Co.* (1975), 29 Ill. App. 3d 848, 330 N.E.2d 573, *appeal denied* (1975), 61 Ill. 2d 598.

■■ Radosta testified that the steering suddenly failed and the failure caused the accident. This testimony alone, if believed, established that the vehicle was defective at the time of the accident. As the court in *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 573-74, 357 N.E.2d 449, 451, stated:

> "Concerning the failure to prove that the brakes were defective, defendant's argument, simply stated, is that the evidence did not show that there was any defect and that evidence of the malfunction when plaintiff was injured did not prove a defect. We do not agree. As the court said in *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 342-43: 'Although the definitions of the term "defect" in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.' "

Of course, the mere fact that the vehicle malfunctions, while it may prove that the vehicle was defective at the time of the accident, does not prove that the defect existed when the vehicle left the manufacturer. (*Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 307 N.E.2d 707.) *Tweedy* established one means of establishing this link when it ruled that a *prima facie* case existed upon proof that in the absence of abnormal use or reasonable secondary causes the product failed to perform in the manner reasonably to be expected. Here, however, as we have already stated, the fact that the rack bar was defective at the time the vehicle left Chrysler's hands, in that it was unreasonably susceptible of bending, was established beyond doubt. Indeed, Agar, Chrysler's witness, admitted that the inability of the rack bar to withstand the force of impact was considered potentially hazardous and that this dangerous condition existed in the vehicle when it left Chrysler's control. Accordingly, we need not decide if Chrysler and Des Plaines are correct in their contention that for *Tweedy* to be applied the plaintiff must establish that as a matter of law there were no reasonable secondary causes or whether it is for the

jury to make that determination. Likewise, we need not determine whether Radosta's alleged negligence could be considered a reasonable secondary cause within the meaning of *Tweedy*. However, we note that it is more reasonable to interpret that term as referring to other possible causes of the defect (see, for example, *Erzrumly v. Dominick's Finer Foods, Inc.* (1977), 50 Ill. App. 3d 359, 365 N.E.2d 684), not other possible independent causes of the accident.

■ In short, we hold that Radosta's testimony that the steering failed and that the accident resulted from this failure created a *prima facie* case sufficient for the jury as to whether the vehicle was defective at the time of the accident and whether that defect caused the accident. Holloman's testimony that the driver appeared to be turning in the direction of the skid, while it tended to contradict Radosta's testimony that he had no control over the vehicle, was simply for the jury to consider. Other evidence, to-wit, the recall letter and the testimony of Chrysler's witnesses established that the vehicle was defective when it left the manufacturer.

### C.

Since we have already concluded that the plaintiff and Radosta established a *prima facie* case without the use of Uzgiris' testimony, it is immaterial whether his testimony failed to establish that a defect was the proximate cause of the accident as Chrysler and Des Plaines contend. We do not agree with their contention that Uzgiris' admission that it was impossible to know scientifically whether the crack in the housing existed before the accident entitled them to judgements as a matter of law. It was uncontradicted that the automobile was defective, and that this defect existed when the automobile left the manufacturer. The only issue for the jury was whether the defect caused the accident in whole or in part. It was not necessary that causation be proved or provable scientifically. Furthermore, Uzgiris assumed that the vehicle was capable of steering at the time of the accident.

■ Chrysler and Des Plaines, both in the trial court and before this court, have contended that Uzgiris' testimony should have been stricken because there was no evidence that the condition of the vehicle immediately after the accident was the same as its condition on the day of his inspection; he testified based on Professor Higgins' metallurgical conclusions which were hearsay; he admitted that he did not know whether the defects he found caused the accident or were caused by the accident. We are inclined to believe the last two contentions are without merit but that the first was meritorious as to some of the testimony but not, obviously as to such testimony as the makeup of the rack rod. However,

we need not decide the question since we find the testimony could not have been prejudicial in light of the fact that the same evidence was discussed in detail by Chrysler's witnesses. A case will not be reversed for an alleged error in admitting evidence where the same kind of evidence or evidence to the same effect is introduced by the complaining party. *Dobkowski v. Lowe's Inc.* (1974), 20 Ill. App. 3d 275, 314 N.E.2d 623, *appeal denied* (1974), 57 Ill. 2d 604; *Barango v. E. L. Hedstrom Coal Co.* (1956), 12 Ill. App. 2d 118, 138 N.E.2d 829, *appeal denied* (1957), 10 Ill. 2d 624, 3 Ill. L. & Prac. *Appeal and Error* § (1953).

## II.

### A.

■ Radosta contends that the verdicts are fatally inconsistent. He contends if he was negligent so as to be responsible to plaintiff, his negligence would bar recovery under the negligence count against Chrysler and Radosta. This, of course, is true. Radosta further contends that since the court ruled that as to the strict liability claim he was not guilty of misuse as a matter of law, he could not have been guilty of negligence because misuse and negligence are identical under the circumstances of this case, citing *Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 311 N.E.2d 128. We disagree.

It is well established in Illinois that contributory negligence is not a defense to an action in strict liability; assumption of risk and misuse are. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305; *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 303 N.E.2d 382.) Neither Chrysler or Des Plaines raised the defense of assumption of risk, so whether or not Radosta assumed the risk by driving after receiving notice of the defect was not a defense to be considered by the jury. The misuse of a product is its use for a purpose neither intended nor forseeable (objectively reasonably) by the manufacturer. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305; *Knapp v. Hertz Corp.* (1978), 59 Ill. App. 3d 241, 375 N.E.2d 1349, *appeal denied* (1978), 71 Ill. 2d 609.) Obviously Radosta's driving of the car was not an unforseeable use of it, and neither Des Plaines nor Chrysler have argued on appeal that it was. Contrary to Radosta's argument, *Lewis* did not (and in light of *Williams* could not without overruling *Williams*) equate contributory negligence and misuse. All it did was indicate that the test of whether the use was reasonably forseeable *by the manufacturer* is as a practical matter the same as that applied to a negligence count. But the mere fact that the use by Radosta was forseeable does not mean that as a matter of law, Radosta could not have been negligent.

## B.

Radosta similarly contends that the court erred in failing to direct a verdict for him contending that the inability to control the vehicle was the sole proximate cause of the accident and that this inability was caused not by Radosta but by Chrysler and Des Plaines.

First of all, the court could not have directed a verdict for Radosta since in light of the other evidence the jury was entitled to disbelieve Radosta's testimony that the steering locked on him. Obviously, however, since the jury also found against Chrysler and Des Plaines it did believe Radosta's testimony. Nevertheless, it was still entitled to find that Radosta's conduct was one of the proximate causes of the accident. A proximate cause is one which causes the injury or damage through a natural and continuous sequence of events unbroken by any effective intervening cause. (*Chapman v. Baltimore & Ohio Railroad Co.* (1950), 340 Ill. App. 475, 92 N.E.2d 466, *appeal denied* (1950), 406 Ill. 1018; *Milostan v. City of Chicago* (1909), 148 Ill. App. 540; *Chicago & Grand Trunk Ry. Co. v. Hoffman* (1898), 82 Ill. App. 453.) To constitute an intervening cause breaking the causal connection the intervening cause must not be forseeable. (*Felty v. New Berlin Transit, Inc.* (1978), 71 Ill. 2d 126, 374 N.E.2d 203; *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93; *Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9.) But here the jury was entitled to find that Radosta could and indeed should have forseen that he might have difficulty steering the car in light of the recall letter. Whether in fact he was reassured by Des Plaines that the car was safe and whether he was entitled to rely on that assurance despite the obvious risk to others were for the jury, not the court, to determine.

It is fundamental in the law of negligence that there may be more than one proximate cause of injury and that one is liable for negligent conduct whether it contributed in whole or in part to the plaintiff's injury, so long as it was one of the proximate causes of injury. (*Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9; *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769.) This was not a case where the jury was required to find that either Radosta was negligent in the manner in which he drove the car or that Chrysler and Des Plaines were guilty of selling a defective product. Rather, as the jury found, this is a classic case of concurrent tortfeasors where separate acts combine to produce a single injury. Compare *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460.

## C.

Radosta also contends that the court erred in instructing the jury that Millette claimed he (Radosta) was negligent in one or more of the following ways:

Failed to keep said vehicle under proper control.

Failed to decrease the speed of his vehicle, so as to avoid colliding with the plaintiff's vehicle.

Swerved said vehicle suddenly, when such movement could not be made with reasonable safety, so as to cause it to run against plaintiff's vehicle.

Drove his vehicle at a speed greater than the posted legal speed limit and without due care for the conditions of the roadway, thereby losing control of his vehicle and causing his vehicle to collide with that of the plaintiff.

Failed to give an appropriate or any notice or warning of the approach and movement of his vehicle to the plaintiff.

Drove his vehicle when he knew, or should have known, that the vehicle contained a defect in the steering system that could cause a loss of control of his vehicle, thereby resulting in a collision,

and that such was the proximate cause of the injury. Radosta objects to the instruction on the grounds there was no evidence to support each and every allegation. We disagree. There was ample evidence from which the jury could have concluded that Radosta failed to keep the vehicle under control, knew the car was defective, etc. It would appear that Radosta's objection to this instruction is based on his theory that the defect in the vehicle was as a matter of law the sole cause of the injury. As we have already ruled, this contention is without foundation.

Radosta also contends that the court erred in instructing the jury that there was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

"No vehicle may be driven upon any highway of this state at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the highway or at a speed which is greater than the applicable statutory maximum speed limit. If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence."

■■ ■ He claims that the giving of the instruction was error because there was no showing that Radosta's speed proximately caused the accident and there was no testimony that there was any ice or snow on the highway. The abstract fails to show that any objection was made to the instruction, so any error has not been preserved for appeal. (*Backlund v. Thomas* (1963), 40 Ill. App. 2d 8, 189 N.E.2d 682.) Furthermore we find no error. The jury was entitled to determine whether it was Radosta's handling of the vehicle that caused him to swerve off the road and

lose control on the ice, and in making such a determination it was entitled to consider any relevant statutes.

### D.

■■ Finally Radosta contends that the trial court erred in ruling that as a matter of law the plaintiff was not contributorily negligent. It is true that normally the issue of contributory negligence is one for the jury. (*Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 307 N.E.2d 707.) Nevertheless, where it is clear as a matter of law that the plaintiff was exercising ordinary care for his own safety that issue is properly taken from the jury. (*Thomas v. Lynch* (1978), 59 Ill. App. 3d 542, 375 N.E.2d 859; *Cribbs v. Daily* (1966), 67 Ill. App. 2d 441, 213 N.E.2d 588; *Martin v. Miles* (1963), 41 Ill. App. 2d 208, 290 N.E.2d 473.) Here the plaintiff was in his own lane when Radosta caromed into him. There was absolutely no evidence that he was doing anything but what he should and we therefore agree that he was as a matter of law free from contributory negligence. *Cribbs v. Daily* (1966), 67 Ill. App. 2d 441, 214 N.E.2d 588.

### III.

All three defendants object to instruction No. 14. That instruction told the jury that they must find for the plaintiff and against one or more of the defendants. In light of the fact that the jury was fully instructed as to negligence, due care, determining credibility of the evidence, etc., it is clear that the instruction did no more than explain the jury forms. The jury was given one form which entitled them to find Radosta liable and Des Plaines and Chrysler not liable. It was given one jury form which entitled them to find Des Plaines and Chrysler liable and Radosta not liable. A third verdict form, the one actually signed by the jurors, allowed them to find all three defendants liable. No form was submitted that would have allowed the jury to find all three defendants not liable.

The basic question before this court is whether based on all the evidence a verdict for all three defendants could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) We agree with the trial court that it could not. The plaintiff, as a matter of law, was not contributorily negligent; his actions were not the cause of his injury. There was no evidence of some unknown cause, or of some intervening act of God. (Compare *Garrett v. S. N. Nielsen Corp.* (1964), 49 Ill. App. 2d 422, 200 N.E.2d 81.) Thus the real issue for the jury to determine was which of the defendants caused the injury. As the court explained in *Krump v. Highlander Ice Cream Co.* (1961), 30 Ill. App. 2d 103, 105-07, 173 N.E.2d 822, 824:

> "We do not agree with defendants' contention, however, that where two vehicles collide, thereby injuring an innocent party, [in

this case a building] no presumption of negligence arises against the owners or operators of the vehicles. On the contrary, we believe a presumption of negligence does arise when the occurrence is shown to proceed from a performance of acts of such character, that when due care is taken, no injury ordinarily results from it. An automobile properly operated does not, under normal conditions, collide with another automobile or strike a building. Where two automobiles collide, under normal conditions, it will be presumed that the collision occurred from the negligent operation of one or both colliding automobiles. (Turner v. Cummings (1943), 319 Ill. App. 225, 48 N.E.2d 225; Herold v. Weitzenfeld (1953), 351 Ill. App. 193, 114 N.E.2d 462.) When one of these two colliding automobiles then collides with a building, negligence is demonstrated, and the damages, if any, are a result of the negligence of one or both operators.

If these vehicles were run as usual, plaintiff's building would not have been damaged. 'Where an accident occurs under circumstances where ordinarily no accident would occur, there is a presumption of defendant's negligence.' (Herold v. Weitzenfeld, 351 Ill. App. 193, 114 N.E.2d 462.) The facts of the instant collision are within the knowledge of the defendants and not the plaintiff, and if one or the other operator was not negligent, the burden is on the non-negligent operator to make the required proof of exculpation. (Turner v. Cummings, 319 Ill. App. 225, 227, 48 N.E.2d 225.) The evidence submitted by plaintiff, although meager, standing alone and considered to be true, together with the legitimate inferences to be drawn therefrom most favorable to plaintiff, tended to prove the elements of an action. (*Pearlman v. W. O. King Lumber Co.* (1939), 302 Ill. App. 190, 23 N.E.2d 826.) Plaintiff has been damaged and should be paid the amount of his damages.

We believe plaintiff made out a prima facie case of defendants' negligence and, therefore, was not required to submit evidence as to which of the defendants was guilty of any negligence. The only question for the jury to decide is which one of the defendants is guilty, or all, and the amount of the damages."

■■ Since a verdict for all three defendants could not stand, it was reasonable for the trial court to refuse to submit a verdict form allowing the jury to find all three defendants not liable. (*Garrett v. S. N. Nielsen Co.* (1964), 49 Ill. App. 2d 422, 200 N.E.2d 81.) It follows that the court did not err in instructing the jury that it could not find for all three defendants. *Thomas v. Cagwin* (1963), 43 Ill. App. 2d 336, 193 N.E.2d 233, *appeal denied* (1964), 28 Ill. 2d 626.

28

It is true that in *Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 382 N.E.2d 239, the Illinois Supreme Court ruled that the trial court did not err in denying the plaintiff's motion for a directed verdict that the jury find any one or more of the defendants guilty of negligence as a matter of law. However, in that case the supreme court held that the issue of contributory negligence was for the jury to decide. Despite some broad language in the opinion we do not believe that the supreme court intended its ruling to be extended to cases such as the one before us where the plaintiff is free from contributory negligence as a matter of law and the defendants in court are the only possible causes of the injury in light of the fact that the court neither discussed any of the Illinois cases cited above nor indicated that they were overruled.

Furthermore, we fail to see how the defendants were prejudiced by the instruction. The jury was simply told it could not not absolve all the defendants from liability. They chose, however, to absolve none. Had the jury returned a verdict against only one defendant, we would agree that it might have felt compelled to do so because of the instruction. But it did not.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.